**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 16, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICK CORTEZ and TINA CORTEZ,

      Plaintiffs-Appellees,

v.

JOHN McCAULEY, JAMES
GONZALES, CURTIS SANCHEZ,
SHUREKE COVINGTON, and JOE
BOWDICH in their individual capacities,
the BOARD OF COMMISSIONERS OF
THE COUNTY OF BERNALILLO,
NEW MEXICO,

      Defendants-Appellants.

and

RAQUEL VILLEGAS,

      Defendant.

No. 04-2062

**ON REHEARING EN BANC**

**Appeal from the United States District Court**
**for the District of New Mexico**
**(USDC No. 02-1458 MCA/DWS)**

Paul J. Kennedy (Mary Y.C. Han with him on the briefs), of Kennedy & Han, P.C.,
Albuquerque, New Mexico, and Caren I. Friedman, Santa Fe, New Mexico, for Plaintiffs-
Appellees.

William D. Slease (Jonlyn M. Martinez with him on the briefs), of Slease & Martinez, P.A., Albuquerque, New Mexico, for Defendants-Appellants.

---

Before **TACHA,** Chief Judge, **EBEL, KELLY**, **HENRY**, **BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, McCONNELL, TYMKOVICH, GORSUCH,** and **HOLMES**, Circuit Judges.

---

**KELLY**, Circuit Judge, joined by **TACHA**, Chief Judge, **EBEL**, **HENRY**, **BRISCOE**, **LUCERO**, and **MURPHY**, Circuit Judges, and joined in part by **HARTZ, O'BRIEN, McCONNELL**, **TYMKOVICH, GORSUCH,** and **HOLMES,** Circuit Judges.

---

We granted rehearing en banc primarily to consider under what circumstances, if any, an excessive force claim is subsumed in an unlawful arrest claim. The panel opinion upheld the district court's denial of qualified immunity except for one excessive force claim, which the panel determined warranted qualified immunity. Cortez v. McCauley, 438 F.3d 980, 1002 (10th Cir. 2006). We reject the notion that an excessive force claim is subsumed in an unlawful arrest claim in the facts presented by this case. Because our conclusion necessitates a change in some of the analysis, we vacate the panel opinion. Our jurisdiction to hear this appeal from the denial of partial summary judgment on qualified immunity grounds arises under 28 U.S.C. § 1291. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). We affirm in part and reverse in part.

Plaintiffs-Appellees, Rick Cortez and Tina Cortez, filed suit alleging claims pursuant to 42 U.S.C. § 1983 as well as claims under New Mexico law, seeking damages from employees of the Bernalillo County Sheriff's Department and the Board of County Commissioners of the County of Bernalillo, New Mexico ("Board"). The Plaintiffs

alleged, inter alia, that the Defendants violated the Plaintiffs' Fourth Amendment rights

by (1) unlawfully arresting and interrogating the Plaintiffs; (2) using excessive force on

the Plaintiffs; and (3) unreasonably searching the Plaintiffs' home. The district court

denied the Defendants' motion for partial summary judgment as to Defendants

McCauley, Gonzales, Sanchez, and Covington. With respect to the other Defendants,

Bowdich and the Board, the court concluded that the Plaintiffs had made a meritorious

showing under Fed. R. Civ. P. 56(f). Consequently, these Defendants' motions for partial

summary judgment were denied without prejudice pending further discovery.

## Background

On May 26, 2001, at 12:24 a.m., the Bernalillo County Sheriff's Department

received a telephone call from a nurse at Saint Joseph's Hospital alerting that Raquel

Villegas ("Ms. Villegas"), had brought her two-year-old daughter to the hospital alleging

that the child had complained that her babysitter's "boyfriend"[1] had "hurt her pee pee."

In response to this allegation, the Defendants McCauley, Gonzales, Sanchez, and

Covington were dispatched to Plaintiffs' residence. The officers did not wait to receive

the results of the medical examination of the child, did not interview the child or her

mother, and did not seek to obtain a warrant.

At approximately 1:00 a.m., the deputies made contact with the Plaintiffs. Rick

Cortez was asleep when he was suddenly awakened by noises and lights in his fenced

---

[1] Plaintiff Rick Cortez is actually the husband of the babysitter Tina Cortez.

back yard. He heard a knock on the front door. Wearing only a pair of shorts, Rick Cortez opened the front door and saw two police officers through the closed screen door. He repeatedly inquired what was going on. The officers did not answer but instead ordered him to exit his house. As he opened the screen door and began to leave the house, the officers seized him, handcuffed him, read him his Miranda[2] rights, and placed him in the back of a patrol car where he was subjected to questioning.

Tina Cortez was awakened by her husband as he got out of bed. Shortly after Rick Cortez left the bedroom, she followed him. She reached the front door just in time to watch the Defendants handcuff her husband and place him in the back of the patrol car. Tina Cortez headed toward the bedroom in order to make a telephone call, but before she could complete the call, Defendant McCauley entered the home, seized her by the arm, and physically escorted her from her home. The officer placed her in a separate patrol car where she was subjected to questioning. Defendant McCauley did allow Tina Cortez to use his cell phone. Both Rick and Tina Cortez indicate that an officer seized the keys to their house, locked the door, and would not let them return for approximately an hour. They allege that when they returned, the Defendants informed them that their dog had been maced and his eyes needed to be washed out. Aplt. App. 23, 63, 64.

Defendants performed a warrantless search of the home, purportedly to find

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966). Miranda warnings are required for custodial interrogation occasioned by an arrest, but not for questioning during an ordinary investigative detention. Berkemer v. McCarty, 468 U.S. 420, 440 (1984); California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam).

additional children that might be present and to eliminate the possibility of any unknown threat to officer safety. During the subsequent interrogations of the Plaintiffs, the Defendants learned that Tina Cortez managed a small day care facility in which she took care of several children. The Defendants further learned that Ms. Villegas had a verbal altercation with the Plaintiffs after the Plaintiffs informed her that they would no longer take care of her child. Additionally, while providing his statement, Rick Cortez also informed the officers that his handcuffs were too tight and caused excessive pain. Despite his declaration and the fact that Rick Cortez supposedly was not under arrest, the officers never loosened the handcuffs.

As these events unfolded at the Cortez residence, Officer Zuniga and Detective Foster made contact with Ms. Villegas at the hospital. Ms. Villegas provided an unsworn written statement in which she described the events that led to her accusation. She also recounted a verbal dispute she had with the Plaintiffs. Additionally, Detective Foster was informed by the nurse who conducted the examination that "no evidence of penile penetration was present." Further, the nurse identified two potential sources of the child's vaginal irritation.[3]

Because the hospital did not find any evidence of molestation, the Plaintiffs were released from detention and permitted to reenter their home. The dispatch report for the incident indicated that they were released sometime between 1:49 a.m. and 2:16 a.m. on

---

[3] The nurse noted that the child had "urine stained underwear on, which could irritate her vagina." The nurse also noted bubble bath as a potential irritant.

May 26, 2001. Rick Cortez was never charged with a crime associated with the allegations of Ms. Villegas.[4]

Based on this early morning encounter with law enforcement officers, the Plaintiffs filed suit. Appellants McCauley, Gonzales, Sanchez, Covington, and Bowdich moved for summary judgment on grounds of qualified immunity as to the § 1983 claims against them in their individual capacities. Defendants McCauley, Gonzales, Sanchez and Covington asserted they did not commit an unreasonable search and seizure against either Plaintiff and that excessive force was not used against either Plaintiff. Defendant Bowdich argued he could not be held liable in his supervisory capacity. Shortly after filing the motion, the Defendants above joined with the Board and moved that discovery be stayed pending the outcome of their motion for summary judgment. On March 17, 2004, the district court denied the Defendants' motion for summary judgment. This appeal followed.

## Standard of Review

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). When a

_____

[4] The Defendants state in their appellate brief and supplemental brief on rehearing en banc that Rick Cortez "may" have violated the child digitally. Aplt. Br. at 5; Aplt. Supp. Br. at 4-5. No evidence in the record supports this completely speculative assertion.

-6-

defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right. Reynolds v. Powell, 370 F.3d 1028, 1030 (10th Cir. 2004). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). If, on the other hand, a violation has been shown, the plaintiff must then show that the constitutional right was clearly established. See id. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation . . . ." Id. at 202. Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful. Id. (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).

We have held that, for a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). The Supreme Court has explained that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The district court's denial of qualified immunity is a question of law which we review de novo. Bisbee v. Bey, 39 F.3d 1096, 1099 (10th Cir. 1994). We review the

evidence in the light most favorable to the nonmoving party.  Id. at 1100.  Summary

judgment is appropriate only "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and . . . the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).


## Analysis

The district court held that both Plaintiffs were arrested and searched and that

genuine issues of material fact existed as to the presence of probable cause.  It also

rejected an investigative detention rationale for the Defendants' conduct, noting that the

Defendants had "not articulated any specific facts that led them to believe Plaintiffs

presented a threat to anyone's safety at the time of the arrest or were about to destroy

evidence of a crime."  Aplt. App. 178.  In a qualified immunity appeal, we are required to

consider those facts which the district court found were sufficient to support the denial of

the motion for summary judgment.  See Behrens v. Pelletier, 516 U.S. 299, 313 (1996).

Our interlocutory jurisdiction is limited to legal questions drawn from facts that are

deemed undisputed for appellate purposes.  Johnson v. Jones, 515 U.S. 304, 313 (1995);

Mitchell, 472 U.S. at 528.  We believe our discussion will be clearer if each Plaintiff is

discussed separately, along with the actions taken against that Plaintiff.

**I. Plaintiffs' Fourth Amendment Claim Against Unreasonable Seizure**

**A. Legal Framework**

In Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000), we stated "[t]he Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests."[5] "Consensual encounters are not seizures within the meaning of the Fourth Amendment and need not be supported by suspicion of criminal wrongdoing." Id.

An investigative detention is "a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." Id. An officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." Id. For an officer to have reasonable suspicion to seize an individual, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id.

A warrantless arrest is permissible when an officer "has probable cause to believe that a person committed a crime." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995). An arrest is distinguished by the involuntary, "highly intrusive" nature of the encounter. Oliver, 209 F.3d at 1186. "[T]he use of firearms, handcuffs, and other forceful techniques" generally exceed the scope of an investigative detention and enter the realm

---

[5] These categories are not static and may escalate from one to another. See United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).

of an arrest. See United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation marks omitted).

### B.    Seizure of Rick Cortez

Viewing the facts in the light most favorable to the Plaintiffs, the district court determined that "the scope and duration of a lawful investigative detention was quickly exceeded in this case, and the situation became a full custodial arrest." Aplt. App. 178. We agree with this characterization as to Plaintiff Rick Cortez. Against this backdrop, we have no difficulty in finding that Rick Cortez has presented facts or allegations showing the Defendants violated a constitutional right, namely the Fourth Amendment right to be free of unreasonable seizure. See Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002). It appears that the officers: (1) grabbed Rick Cortez, barefoot and wearing only shorts, and pulled him from the doorway of his home; (2) handcuffed him; (3) advised him of his Miranda rights; (4) placed him in the back seat of the locked patrol car; and (5) questioned him while he was in the back seat of the locked patrol car. We also note that the encounter took place after midnight.[6]

---

[6] See Tennessee v. Garner, 471 U.S. 1, 8 (1985) (holding that reasonableness depends in part on when the seizure is made).

In evaluating whether the events leading up to this arrest amount to probable cause, we ask whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause. Maryland v. Pringle, 540 U.S. 366, 371 (2003); Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000). Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime. Pringle, 540 U.S. at 371 n.2. As noted, the only information which arguably implicated Rick Cortez was a statement attributed to a barely-verbal two-year old child that her babysitter's "boyfriend" had "hurt her pee pee." The statement was relayed by telephone to the officers, from the nurse, who heard it from the mother who ostensibly heard it from the two-year old. Rather than waiting to receive the results of the medical examination of the child, interview the child or her mother to better understand the circumstances, or seek to obtain a warrant, the officers responded to the statement with an immediate arrest of the babysitter's husband, Rick Cortez.

Plainly, whether we view it as a need for more pre-arrest investigation because of insufficient information, see Valenzuela, 365 F.3d at 902,[7] or inadequate corroboration,

_____

[7] A concurring and dissenting opinion "do[es] not doubt for a moment that additional investigation would have been a good idea," but then suggests that considering that possibility is "second-guessing" the officers. C&D Op. at 4-5 (Gorsuch, J. concurring in part, and dissenting in part). The reason for the lack of doubt surely is because of the absence of probable cause in this case; merely because officers are not required to do a more thorough investigation once they have probable cause "does not suggest that an officer has *no* duty to investigate an alleged crime before making an

-11-

what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by Rick Cortez. See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."). Based on the facts above, Rick Cortez was arrested without probable cause.[8] This warrantless

_____

arrest." Gardenhire, 205 F.3d at 318.

[8] When the officers seized Rick Cortez, one of the officers apparently told him that he was not being arrested but that he had merely been placed in investigative detention. Aplt. App. 56. Therefore, the officers may have believed that they were not effecting an arrest but rather an investigative detention. The officers' subjective beliefs are irrelevant. See United States v. Charley, 396 F.3d 1074, 1080 (9th Cir. 2005). See also Graham v. Connor, 490 U.S. 386, 397 (1989) (applying the same principle to the issue of excessive force). Defendants characterize the encounter between the Defendants and both Plaintiffs as an investigative detention but regardless contend that they had probable cause to arrest Rick Cortez. Aplt. Br. at 13. Essentially, their argument is that they had probable cause to arrest Rick Cortez and place him in investigative detention. Aplt. Reply Br. at 6; but see Florida v. Royer, 460 U.S. 491, 499 (1983) (plurality op.) (an investigative detention may be violative of the Fourth Amendment absent probable cause where it approaches the conditions of an arrest). Before the district court, the Defendants argued:

> The County Defendants could have arrested Plaintiff Rick Cortez and taken him to the Detention Center that very night. Law enforcement officers do not need to wait for the convenience of an alleged child molester before they effectuate their duties. On the contrary, there exists an inherent exigency when law enforcement receives a report of child molestation.

Aplt. App. at 110. As did the district court and the panel, we reject this sweeping argument, untethered to basic Fourth Amendment principles.

-12-

arrest constitutes a constitutional violation.[9]

Under the second sequential question, we must also find that the right was clearly established when the alleged violation occurred. The law was and is unambiguous: a government official must have probable cause to arrest an individual. See Tennessee v. Garner, 471 U.S. 1, 7 (1985); United States v. Watson, 423 U.S. 411, 417-22 (1976); Olsen, 312 F.3d at 1312 (warrantless arrest without probable cause violates an arrestee's clearly established Fourth Amendment rights). Furthermore, it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d 1252, 1259 (10th Cir. 1998) ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."). In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming. Defendants, however, did not: (1) interview the girl, her mother, the nurse, or the doctor; (2) inspect the girl's clothing for possible signs of sexual assault; or (3) wait for a preliminary report from the doctor. In other words, Defendants conducted no investigation. Instead, the Defendants relied on

---

[9] The en banc court is unanimous that probable cause was lacking to effect a warrantless arrest of Rick Cortez.

-13-

the flimsiest of information conveyed by a telephone call.

Defendants rely upon the alleged statement of a two-year-old child which was relayed to them by a nurse, who heard it from the girl's mother. The fact that hearsay evidence would not be admissible at trial to prove guilt does not make it unusable as a source of probable cause for a warrantless arrest. See United States v. Swingler, 758 F.2d 477, 487 (10th Cir. 1985). Defendants have cited the "excited utterance" exception to the hearsay rule contained in Fed. R. Evid. 803(2). Arguably, the statement might also fall within the "medical diagnosis" exception of Fed. R. Evid. 803(4), but there is no need to engage in such analysis. The statement is not being presented for the truth of the matter asserted therein; the issue is whether the officers were justified in relying upon it alone.[10]

_____

[10] A concurring and dissenting opinion reminds us that hearsay may be relied upon in establishing probable cause. C&D Op. at 6 (Gorsuch, J., concurring and dissenting). No one disputes that hearsay (with sufficient indicia of reliability) may be considered as part of the totality of the circumstances in making a probable cause determination. See Illinois v. Gates, 462 U.S. 213, 233 (1983). The double-hearsay statement in this case could be considered; but it was insufficient, in and of itself, to support probable cause.

That concurring and dissenting opinion suggests that the officers had other facts corroborating the statement. C&D Op. at 7-8 (Gorsuch, J., concurring and dissenting). It relies on the fact that the mother (whom that concurring and dissenting opinion assumes knew the child best) believed a crime occurred given that she took the child to the hospital, hospital authorities (presumably, the nurse) reported the allegation to law enforcement, and the child's statement could be consistent with how a child might report being molested. The record does not contain any express evidence that the officers were aware of the nature of the mother's relationship with the child, her opinion concerning the complaint or that the nurse made some sort of decision concerning the allegations. The fact that New Mexico state law requires prompt reporting and action on complaints of child abuse, see N.M. Stat. Ann. § 32A-4-3, does not suggest, let alone require, non-compliance with the requirements of the Fourth Amendment, see Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1249, 1252 (10th Cir. 2003). Merely because the officers claimed that they were investigating a serious felony and sought to separate the accused

That unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause should have been patently obvious to any reasonable law enforcement official.[11]  Even without prior case law on point, therefore, we would harbor no qualms concluding, based solely on cases like Garner and Watson, that the officers were on reasonable notice that their actions ran afoul of the Fourth Amendment.  This follows from the fact that the Supreme Court has instructed that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."  United States v. Lanier, 520 U.S. 259, 271 (1997); see also Hope, 536 U.S. at 740-41.

Nonetheless, we have previously held that a bare allegation of wrongdoing, without any investigation, in some circumstances, may not give rise to probable cause.  In

from any other children that might be in the home does nothing to provide a factual basis for such a claim as we discuss below.  See also supra, n.8.  The concurring and dissenting opinion of Judge Gorsuch comes very close to saying that, because the allegation was made, repeated by others, and acted on by law enforcement personnel, this particular statement was trustworthy.

[11]  Again, we do not suggest a per se rule that unsubstantiated double-hearsay testimony can never give rise to probable cause.  There, in fact, may be situations in which a double-hearsay statement involves individuals or circumstances of sufficient trustworthiness to give rise to probable cause.  Cf. Baptiste, 147 F.3d at 1256 (explaining that an officer has probable cause when he "receives information about an alleged offense from a witness who it seems reasonable to believe is telling the truth . . ." (internal quotation omitted)).  What should have given any reasonable law enforcement officer pause, in this case, is that the allegation originated with a two-year old child, was passed along from child to mother to nurse and finally to law enforcement, and was precipitously acted upon to arrest without further confirmation or investigation.  That probable cause to arrest was lacking under such a scenario should have been obvious.

Baptiste, we affirmed the denial of qualified immunity for officers who relied solely on the statements of store security guards–despite having seen a contradictory security videotape capturing the events in question–to establish probable cause for arrest. Id. at 1254.[12] Notably, we held that there was an unconstitutional arrest lacking probable cause because the officers had relied solely on the statements of individuals who ostensibly witnessed an alleged crime. Additionally, we held that the illegality of the sole reliance on the security guards' statements, without additional investigation, was clearly established. Id. at 1258-59. In so doing, we explained that, based on prior case law, "a reasonable officer would have known [that the] failure to investigate violated the constitutional or statutory rights of the plaintiff." Id. at 1258. Similarly, in the instant case, officers relied, without any investigation, exclusively on the double-hearsay statement of a nurse who had no personal knowledge of the actual facts. In light of Baptiste, the officers were on notice that this uncorroborated double-hearsay statement was insufficient to establish probable cause, especially given that the officers could easily have interviewed the nurse, Ms. Villegas, or the girl before moving to arrest Mr. Cortez.[13]

---

[12] In Baptiste, we held that "[o]fficers may not rely solely on a security guard's allegations when the officers have before them an exact replication of all the information on which the guard's allegations are based." 147 F.3d at 1257. Similarly, in the instant case, it was unreasonable for the officers to rely on the nurse's double-hearsay statement about what the girl said, when they could have interviewed the girl or her mother directly.

[13] In fact, the need for investigation was much greater in this case, where officers relied solely on the statement of one individual who had not witnessed the alleged crime, than in Baptiste, where officers relied on the statements of multiple individuals who had actually witnessed the alleged crime.

In Easton v. City of Boulder, 776 F.2d 1441 (10th Cir. 1985), we declined to discount the statements to police of a three-year-old and a five-year-old regarding child abuse based solely on their age, despite some apparent inconsistencies and even though such testimony might not be admissible in court. Id. at 1449. We specifically found, however, that the five-year-old's statement had "corroborated all the facts given by [the three-year-old] . . . with respect to the assault [the five-year-old] witnessed." Id. at 1443. Here, no such corroboration was present. Additionally in Easton, we found that details in both childrens' statements regarding the plaintiff's residence and the site of the assault were independently corroborated by police investigation. Id. at 1450.

United States v. Shaw, 464 F.3d 615 (6th Cir. 2006), is a case virtually on all-fours with the instant case with respect to the probable cause inquiry. The panel majority found probable cause wanting for an arrest of the defendant based upon a mother's hearsay statements to medical personnel later reported to military police. Id. at 626. According to the mother, her three-year-old son claimed that the defendant "had 'touched his pee-pee'" and that the defendant's "'pee-pee had touched his butt.'" Id. at 618. The examining physician found no evidence of trauma or penetration. The child was not interviewed and no effort was made to corroborate the allegations as reported by the mother. The Shaw panel majority stated:

> We are not aware . . . of any situation in which the uncorroborated hearsay statement of a child as young as three, standing alone, has been considered sufficient to establish probable cause.
> . . .
> [W]e see no way to affirm the district court's finding of probable cause in

-17-

> this case without carving out what would amount to an exception to the probable-cause requirement in child-molestation cases. We decline to adopt such an exception.
>
> . . .
>
> We hold only that the mother's bare-bones hearsay accusation in this case, with no corroborating evidence, did not suffice to establish probable cause, and that the ensuing arrest was therefore unlawful.

Id. at 624, 626. Both the panel majority and dissent cited the panel opinion in this case with approval,[14] the Shaw panel majority also recognized that our decision in Easton simply does not support the notion that an uncorroborated hearsay statement of a three-year old involving sexual touching provides probable cause. Shaw, 464 F.3d at 624-26.

In sum, we find that viewing the undisputed facts in the light most favorable to the Plaintiffs, an arrest without probable cause occurred. As we discuss below, no exigent circumstances would justify a warrantless arrest either. This conclusion does not, however, end our analysis. Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity. Romero, 45 F.3d at 1476.[15] Therefore, when a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff.

This principle may appear to be in some tension with the equally established principle that "it is a jury question in a civil rights suit whether an officer had probable

---

[14] The dissent in Shaw indicated its approval of the probable cause analysis in Cortez. Shaw, 464 F.3d at 631, 633 (Sutton, J. dissenting).

[15] Some courts have referred to this standard as "arguable probable cause." See, e.g., Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999).

-18-

cause to arrest." DeLoach v. Bevers, 922 F.2d 618, 623 (10th Cir. 1990). The tension is resolved in this case by the essential lack of dispute over the historical, predicate facts. The parties agree on the "what happened" questions. In such a circumstance, for qualified immunity purposes, there is no such thing as a "genuine issue of fact" as to whether an officer "should have known" that his conduct violated constitutional rights. See Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000).[16] The conduct was either objectively reasonable under existing law or it was not. Id. We find the officers did not have "arguable probable cause" to arrest Rick Cortez because, as mentioned above, the information relied on to conduct the seizure was not reasonably trustworthy information sufficient on its own to justify the seizure.

While agreeing that probable cause was not present and that this case requires a different result than Easton, a concurring and dissenting opinion repeatedly questions "[w]hat exactly would have put the officers on clear notice that relying on a two-year-old's statement to support the arrest of Mr. Cortez was impermissible?" C&D Op. at 9 (Gorsuch, J., concurring and dissenting). As a factual matter, it is undisputed that the ostensible purpose of the officers' visit to the home was "to secure the location of the alleged offender in order to preserve evidence of the alleged molestation so that [they]

_____

[16] Of course, this court lacks jurisdiction over an appeal from the denial of a defendant's summary judgment order based on qualified immunity insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial. Johnson, 515 U.S. at 319-20. We may exercise jurisdiction over such an order when we are presented with "neat abstract issues of law." Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997).

could obtain a search warrant if necessary pending the findings of the preliminary investigation at the hospital" and to find out "whether Mr. Cortez had access to other children." Aplt. App. at 56, 122. Settled law makes it clear that probable cause is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information. Hunter v. Bryant, 502 U.S. 224, 228 (1991); Beck v. Ohio, 379 U.S. 89, 91 (1964). No reasonable officer could have believed that the double-hearsay statement of the nurse constituted sufficient facts and circumstances based on reasonably trustworthy information to supply probable cause in these circumstances.[17] We make no apologies for looking at what information the officers possessed against a backdrop of the known progress of their investigation, including the steps that had not been taken at the time Rick Cortez was arrested. The sequence of the investigation that **did occur** is plainly part of the facts in this case–and it is clear that the officers got ahead of themselves insofar as arresting Rick Cortez, entering the residence and subjecting Tina Cortez to an investigative detention. Of course, additional investigation that does not uncover anything does not aid in a probable cause determination. Likewise, if there is no evidence or only enough for suspicion, the import of our cases is that additional investigation may well be necessary in order to uncover

---

[17] This may explain why as a factual matter the Defendants at the time maintained that they merely were placing Mr. Cortez in investigative detention and told him that he was not being arrested. Aplt. App. 56.

additional evidence and establish probable cause.[18]

The concurring and dissenting opinion of Judge Gorsuch suggests that a reasonable officer would conclude "that a statement emanating from the victim of an alleged sexual assault, with little more, is sufficient to supply probable cause," based on the holding of Easton and the background law concerning victim statements, and that Easton did not clearly preclude what occurred here. C&D Op. at 9 & n.7. Easton may be read to hold that ordinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy. But only if the facts of cases do not matter, would the expansive and incorrect interpretation put forth by the concurring and dissenting opinion be plausible. In Easton, the police twice interviewed the children and possessed ample corroborating evidence. In this case, the child was not interviewed by law enforcement once, let alone twice, nor was anyone else prior to the arrest. Although Easton did state that the scrutiny reserved for informants is relaxed for victim-witnesses, it still required reasonably trustworthy information for probable cause in this context. 776 F.3d at 1450. The dicta in Easton that statements of the children could have established probable cause deals with their direct statements to the officers–something not present in this case.

The law was clearly established that the double-hearsay statement of a nurse,

---

[18] We agree that once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. Baker v. McCollan, 443 U.S. 137, 145-46 (1979); Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir. 1999). In this case, however, probable cause was lacking in the first place.

based on information allegedly provided by a two-year-old child and reported in a telephone call, does not establish probable cause and that more information is necessary. See Shaw, 464 F.3d at 624 (discussing cases involving child-testimony and noting that the child's testimony was not the only evidence supporting probable cause). To be sure, we have held that corroboration is not essential for victim-witnesses, though in those cases we have held that the victim's statements were amply corroborated. See United States v. Patane, 304 F.3d 1013, 1017 (10th Cir. 2002), rev'd on other grounds, 542 U.S. 630 (2004); Easton, 776 F.2d at 1449-1450. Regardless, both Patane and Easton involved statements by victims, not double-hearsay, and both cases noted that no facts suggested an ulterior motive for such statements. Patane, 304 F.3d at 1017; Easton, 776 F.3d at 1450-51.

Our cases suggest a duty to investigate to ascertain information on whether a crime occurred at all.[19] Although the concurring and dissenting opinion of Judge Gorsuch distinguishes the application of the general rules in Romero and Baptiste, which suggest that additional investigation may sometimes be necessary in order to generate information supporting probable cause, precise factual correspondence is not necessary. Anderson v. Blake, 469 F.3d 910, 913-14 (10th Cir. 2006). The approach taken by the concurring and dissenting opinion of Judge Gorsuch is tantamount to requiring a case on all fours before

_____

[19] While it is true that Plaintiffs should cite to what constitutes clearly established law, we are not restricted to the cases cited by them. Elder v. Holloway, 510 U.S. 510, 513-14 (1994). Whether law is clearly established is a legal question, reviewed de novo, with full knowledge of the law. Id. at 516.

government officials could be held liable–all that is required is that "in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987); Martin v. Board of County Comm'rs, 909 F.2d 402, 407 (10th Cir. 1990). We believe that the duty to investigate prior to a warrantless arrest is obviously applicable when a double-hearsay statement, allegedly derived from a two-year-old, is the only information law enforcement possesses.

C.     **Seizure of Tina Cortez**

We now turn to the seizure of Tina Cortez. Taking the Plaintiffs' allegations as true, and viewing the evidence in the light most favorable to the Plaintiffs, it appears that Tina Cortez (1) was ordered out of her house by the officers; (2) returned to her bedroom (though it is unclear whether she did so after exiting the house in response to the officers' orders, or without exiting the house); (3) was physically separated from her telephone by an officer illuminating the bedroom with a flashlight; (4) was taken by the arm and escorted from her home, (5) was placed in the back seat of a locked patrol car; and (6) was questioned by an officer while in the back seat of the locked patrol car. While in the back seat of the locked patrol car, Tina Cortez was allowed to use an officer's cell phone. The officers seized the keys to the home and locked it. Again we note that all this occurred after midnight.

The seizure of Tina Cortez was less intrusive than that of Rick Cortez to be sure. She was not advised of her Miranda rights, was not handcuffed, was allowed to use the officer's cell phone, generally seemed to be subjected to less force than Rick Cortez, and

-23-

did not seem to be the object of the officers' primary suspicions. Taking the undisputed facts in the light most favorable to the Plaintiffs, these facts establish an investigative detention. Cf. Muehler v. Mena, 544 U.S. 93, 100 (2005) (making clear that detaining individuals under intrusive conditions does not automatically convert the detention to an arrest).

We again examine the officers' factual basis. As previously stated, an investigative detention must be based upon reasonable suspicion. The court views the totality of the circumstances to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002). Just like her husband's seizure and detention, the seizure and detention of Tina Cortez was based solely on the allegations of a two-year-old girl. The girl's alleged statement, however, asserted no wrongdoing whatsoever as to Tina Cortez. No facts suggest that any evidence was about to be destroyed or that the Defendants or anyone else was somehow endangered by Tina Cortez. See Walker v. City of Orem, 451 F.3d 1139, 1149-1150 (10th Cir. 2006) (90-minute detention of non-suspects with no exigencies could not be justified on an investigative detention rationale and violated the Fourth Amendment).

An investigative detention must be supported by reasonable suspicion. Hilbel v. Sixth Judicial Dist. Court of Nevada, 542 U.S. 177, 185 (2004). Here there was none. Likewise, the law is clearly established that warrantless entry into the home by law enforcement is not permitted absent exigent circumstances. Brigham City v. Stuart, 126

S. Ct. 1943, 1947 (2006); <u>Payton v. New York</u>, 445 U.S. 573, 590 (1980).  As we discuss below, there were no exigent circumstances.  Therefore, we find that Tina Cortez has demonstrated that a clearly established constitutional right has been violated.  Consequently, the Defendants are not entitled to qualified immunity as to her wrongful seizure claim, as the existence of neither reasonable suspicion nor "arguable reasonable suspicion" has been shown.

## II.     Exigent Circumstances

### A.     Legal Framework

The Defendants contend that they had probable cause to arrest Rick Cortez and that exigent circumstances were present in this case that allowed them to enter the Cortez home, seize Rick and Tina Cortez, and conduct a search of the house.  Aplt. Br. at 14.  Exigent circumstances may exist when there is a "plausible claim of specially pressing or urgent law enforcement need," <u>Illinois v. McArthur</u>, 531 U.S. 326, 331 (2001), for example the imminent destruction of evidence, <u>see</u> <u>Georgia v. Randoph</u>, 126 S. Ct. 1515, 1525 n.6 (2006).  Obviously, officers may not simply recite urgent needs without factual support.  Otherwise, the exception swallows the rule.[20]  Exigent circumstances in an emergency situation exist when: (1) the law enforcement officers have objectively reasonable grounds to believe that there is an immediate need to protect their lives or others, and (2) "the manner and scope of the search is reasonable."  <u>United States v.</u>

---

[20]  For similar reasons, we reject Defendants' argument that New Mexico law requiring prompt investigation of child abuse allegations necessarily creates an "inherent exigency."  <u>See</u> <u>supra</u>, nn. 8 & 10.

Najar, 451 F.3d 710, 718 (10th Cir. 2006); see also United States v. Huffman, 461 F.3d 782, 783 (6th Cir. 2006) (in relying upon the "risk-of-danger" exception to the warrant requirement, the government "must show that there was a risk of serious physical injury posed to the officers or others that required swift action.").

## B.    Application

The Defendants have offered nothing, beyond innuendo and speculation, to establish objectively reasonable grounds of an emergency, i.e., an immediate need to protect their lives or others from serious injury or threatened injury. They have failed to articulate any specific facts that led them to believe the Plaintiffs posed a threat to the officers or others. In fact, the record indicates the opposite conclusion is appropriate. The record establishes that the Plaintiffs were asleep at the time the Defendants arrived at the home. The interior, as well as exterior lights, were off. Rick Cortez answered the door wearing only a pair of shorts. He cooperated with the officers as they voiced their commands. No evidence in the record suggests the presence of other people in the home. Additionally, no evidence in the record establishes actual or threatened injury to any person or imminent violence. The only basis for the search was the unsubstantiated allegation of the nurse regarding a child at another location. We do not believe this evidence establishes the existence of emergency conditions at the Cortez home. Therefore, we agree with the district court that a finding of exigency was inappropriate.[21]

---

[21] The district court recited our prior test concerning exigent circumstances in an emergency. Aplt. App. 77-78. We previously held that exigent circumstances exist when: (1) the law enforcement officers have reasonable grounds to believe that there is an

Additionally, we have held that warrantless entry into homes is allowed if: (1) clear evidence of probable cause exists of, (2) a serious crime where destruction of evidence is likely, (3) any such search is limited in scope, and (4) it is supported by clearly defined indicators of exigency that are not subject to police manipulation. United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996). In spite of the fact that the Defendants failed to establish factors one, two, or four, they argue that the warrantless entry into the home was constitutional. We affirm the ruling of the district court denying qualified immunity in this regard.

## III. Excessive Force Claims

Plaintiffs also allege a violation of their rights under the Fourth and Fourteenth Amendments to be free from the use of excessive force. Specifically, Plaintiffs claim that Defendants used excessive force in seizing them. Aplt. App. 25; Aplee. Br. 21-24.

### A. Legal Framework

"[T]he right to make an arrest or investigatory stop necessarily carries with it the

---

immediate need to protect their lives or others; (2) the search is not motivated by an intent to arrest and seize evidence; and (3) there is some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched. See Najar, 451 F.3d at 718. In light of Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006), which rejected subjective intent as a factor and did not expressly require probable cause, we reformulated the test in Najar essentially to consist of the first objective element and a requirement that the manner and scope of the search be reasonable. Najar, 451 F.3d at 718. The district court decided the issue on the lack of objective reasonableness for an emergency, viz. an immediate need to protect the lives or safety of anyone, as do we. Aplt. App. at 185 ("There is no particularized and objective basis for concluding that there was any imminent danger to persons inside or outside the residence, or that any evidence was about to be destroyed, or that any suspect was about to flee or escape.").

right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). The degree of physical coercion that law enforcement officers may use is not unlimited, however, and "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Id. at 395. In defining the parameters of this reasonableness standard, the Graham Court stated:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

490 U.S. at 396 (internal citations and quotations omitted); see also Garner, 471 U.S. at 8-9 ("[T]he question [is] whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.").

The Graham Court continued:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain,

and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Graham, 490 U.S. at 396-97 (internal citations and quotations omitted). Furthermore, we have previously held that "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests–a person's sense of security and individual dignity." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1196 (10th Cir. 2001) (internal quotation omitted).

We analyze the force applied in this case in the context of an arrest (Rick Cortez) and an investigative detention (Tina Cortez). While the nature of the inquiry under either alternative does not differ, see Graham, 490 U.S. at 396, the benchmark for what is reasonable does differ, see United States v. Merritt, 695 F.2d 1263, 1274 (10th Cir. 1982). This is in part because police have historically been able to use more force in making an arrest than in effecting an investigative detention. Cf. United States v. Perdue, 8 F.3d 1455, 1464 (10th Cir. 1993) ("[H]istorically, the maximum level of force permissible in a standard Terry stop fell short of placing the suspect in 'custody' for purposes of triggering Miranda.").

Thus, the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case. Thus, in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

We first consider Defendants' use of force against Rick Cortez, then Defendants' use of force against Tina Cortez. For the reasons stated below, we reverse the district court's denial of qualified immunity to Defendants on the claim that Defendants used excessive force in their dealings with Rick Cortez but affirm with respect to the claim that Defendants used excessive force in their dealings with Tina Cortez.

**B.     Defendants' Use of Force Against Rick Cortez**

We take Plaintiffs' allegations as true and view the evidence in the light most favorable to them. See Kirkland v. St. Vrain Valley Sch. Dist., 464 F.3d 1182, 1188 (10th Cir. 2006). It appears that Defendants (1) grabbed Rick Cortez by the arm and pulled him from the doorway of his home; (2) handcuffed him; (3) placed him in the back seat of a locked patrol car—all in the middle of the night, and (4) ignored his pleas that the handcuffs were too tight and hurting him.

As discussed above, if Plaintiffs' allegations are taken as true, Rick Cortez was arrested. See Kaupp v. Texas, 538 U.S. 626, 631 (2003) ("A . . . boy was awakened . . .

at three in the morning by at least three police officers . . . .  He was taken out in handcuffs, without shoes, dressed only in his underwear in January, placed in a patrol car, driven to the scene of a crime and then to the sheriff's offices, where he was taken into an interrogation room and questioned.  This evidence points to arrest . . . .").  Because it also appears, when the evidence is construed in the light most favorable to Plaintiffs, that Defendants lacked probable cause for this arrest, we held above that Defendants are not entitled to qualified immunity on Plaintiffs' claim that Rick Cortez was seized unreasonably.  Because the properly supported summary judgment facts suggest an arrest, we analyze the seizure of Rick Cortez as an arrest.  We hold that the officers are entitled to qualified immunity on this claim.

Initially, we reject the idea contained in the panel opinion that a plaintiff's right to recover on an excessive force claim is dependent upon the outcome of an unlawful seizure claim.  See Cortez, 438 F.3d at 995-96.  Relying on Eleventh Circuit cases, the panel opinion held that "a plaintiff may not recover on an independent excessive force claim merely because force was applied during an unlawful seizure."  Id. at 996.  See Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000); Williamson v. Mills, 65 F.3d 155, 158-59 (11th Cir. 1995) (per curiam).  Thus, were a plaintiff to prevail on an unlawful arrest claim, the plaintiff would not be allowed to recover on an excessive force claim arising out of the arrest.  Properly applied, such a rule might control where a plaintiff's excessive force claim is dependent solely on the absence of the power to arrest or detain.  See Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006).

-31-

We need not decide that issue, however, because Rick and Tina Cortez have made broader allegations concerning the circumstances of their seizures that might suggest excessive force. See Cortez, 438 F.3d at 1003-04 (Henry, J., concurring in part and dissenting in part).

Even under the Eleventh Circuit's rule, "[w]hen properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." Bashir, 445 F.3d at 1332. A contrary interpretation would conflict with the Supreme Court's direction that courts engage in careful balancing and examine excessive force claims under a Fourth Amendment reasonableness standard as discussed above. See Graham, 490 U.S. at 396-95. Moreover, a contrary interpretation risks imposing artificial limits on constitutional claims without any basis other than a fear that such a distinction might be too fine for a jury (a fear we do not agree with).

We hold that in cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the

-32-

evidence may overlap.[22]  The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.[23]

Should the officers move for qualified immunity on an excessive force claim, a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have not thought the force constitutionally permissible (violates clearly established law).

We now consider Plaintiffs' claim that Defendants used excessive force against Rick Cortez in arresting him.  In his affidavit, Rick Cortez contends that he was "grabbed

_____

[22] The concurring and dissenting opinion of Judge Hartz suggests that "we would do better simply to recognize one cause of action . . .: a claim for invasion of Fourth Amendment rights of the person."  C&D Op. at 2 (Hartz, J., concurring and dissenting). That cause of action would consider the information available to an officer, what action such information justified (such as detention or handcuffing), and then assess damages for any action not so justified as excessive force.  Id. at 3.  Whereas the panel opinion collapsed excessive force claims into unlawful seizure claims, this approach appears to collapse unlawful seizure claims into excessive force claims.  We remain convinced that the two rights are separate and plaintiffs may proceed under either or both, depending on the facts.  See Bashir, 445 F.3d at 1332.  The implementation of the suggested approach of Judge Hartz–a bifurcated trial process, with a break in-between so that a trial court could conduct a qualified immunity analysis and decide what conduct could be unlawful sounds somewhat complex, if not supported by precedent.

[23] A similar analysis applies to claims of unlawful detention and excessive force: in cases involving claims of both unlawful detention and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the detention and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked reasonable suspicion, he is entitled to damages for the unlawful detention, which includes damages resulting from any force reasonably employed in effecting the detention.  If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful detention, he is entitled to damages resulting from that excessive force.  These two inquiries are separate and independent, though the evidence may overlap.

and pulled out of the house" by one of the officers, and, after being handcuffed and put into the back seat of a patrol car, he complained that the handcuffs were too tight.

> I told the officer in the car with me that the handcuffs were too tight and hurting me. No action was taken to loosen the handcuffs. The handcuffs left red marks on both of my wrists for several days. My wrists were so marked that they were visible to casual observers.

Aplt. App. 88. Defendants argue that because Rick Cortez was accused of committing a violent felony, the Defendants' actions toward him, including ignoring his plea concerning the handcuffs, were appropriate under the circumstances. Aplt. Br. at 19. The Defendants also argue that because no proof of injury was provided either from health care providers or photographs, the self-serving contentions of the Plaintiffs will not suffice. Aplt. Br. at 19.

Although the severity of the alleged offense is a factor in evaluating an excessive force claim, a court must also consider officer safety concerns and whether the suspect cooperates or resists. Graham, 490 U.S. at 396. There is no indication in the record that Rick Cortez actively resisted seizure or attempted to evade seizure by flight. Rick Cortez opened the door of his residence to police voluntarily. Aplt. App. 88, 96. Although Rick Cortez briefly asked Defendants what was going on before he complied with their commands to exit the residence, Aplt. App. 87, this does not amount to resistance. Likewise, there is no indication in the record that Rick Cortez posed an immediate threat to the safety of Defendants or others. He came to his front door wearing only shorts and

cooperated fully.  Nothing suggests that the Plaintiffs were armed or that other persons besides the Plaintiffs were present.

We have little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment.  See Atwater v. City of Lago Vista, 532 U.S. 318, 354-55 (2001) (noting that a normal lawful custodial arrest where one is handcuffed, placed in a patrol car, and taken to the police station may be inconvenient and embarrassing, but not violative of the Fourth Amendment); Graham, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").  Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

The closer issue is whether the failure to adjust Rick Cortez's handcuffs during an arrest constitutes excessive force.  In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was

otherwise made aware) that the handcuffs were too tight.[24] See, e.g., Lyons v. Xenia, 417

F.3d 565, 575-76 (6th Cir. 2005); Herzog v. Village of Winnetka, 309 F.3d 1041, 1043

(7th Cir. 2002); Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993). Although Rick

Cortez complained to the officer that the handcuffs were too tight, the summary judgment

record presents too little evidence of any actual injury. We believe that a claim of

excessive force requires some actual injury that is not de minimis, be it physical or

emotional.[25] The only evidence in the record is his affidavit that the handcuffs left red

marks that were visible for days afterward. Aplt. App. at 88. This is insufficient, as a

---

[24] In Hannula v. City of Lakewood, 907 F.2d 129 (10th Cir. 1990), we analyzed a tight handcuffing claim under a substantive due process standard that required that the force be inspired by malice or by excessive zeal that shocks the conscience. Id. at 131-32. We held that, for purposes of qualified immunity, the plaintiff had not shown the violation of a clearly established right, given a lack of evidence of physical injury or "apparent physical damage to the plaintiff's wrists." Id. at 132. Merely because the handcuffs caused pain was deemed insufficient. Id.; see also Bella v. Chamberlin, 24 F.3d 1251, 1257-58 (10th Cir. 1994) (analyzing excessive force claim that occurred prior to a seizure under a due process standard and observing that this circuit had yet to decide whether an excessive force claim without physical injury could succeed). Hannula is of limited value because the proper analysis is that contained in Graham, 490 U.S. at 396-95, which does not require a showing that the force shocks the conscience or was motivated by malice. Moreover, we subsequently held that proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element of an excessive force claim, though the absence of injury in the context of the totality of the circumstances may suggest the absence of excessive force. Holland, 268 F.3d at 1195.

[25] Plaintiffs alleged that Defendants use of excessive force caused such injury. Aplt. App. at 26, ¶ 29. In order to recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional. See Tarver v. City of Edna, 410 F.3d 745, 752 (5th Cir. 2005) (allegations of de minimis physical harm from handcuffing were insufficient, nor did plaintiff demonstrate "that he suffered psychological injury from the handcuffing").

matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified.

We hold that the force established does not exceed what would have been reasonable to effectuate a lawful arrest under these circumstances. Therefore, whether or not the arrest itself was lawful, Plaintiffs' claim that Defendants used excessive force against Rick Cortez should not survive summary judgment. Even taking Plaintiffs' allegations as true and viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have not established that Defendants' use of force against Rick Cortez violated his Fourth and Fourteenth Amendment right to be free from the use of excessive force. In other words, the Defendants are entitled to qualified immunity on Rick Cortez's excessive force claim because no constitutional violation occurred. We therefore reverse the district court's denial of summary judgment to Defendants as to Plaintiffs' claim that Defendants used excessive force against Rick Cortez in connection with an arrest.

## C.     Defendants' Use of Force Against Tina Cortez

Taking Plaintiffs' allegations as true, and viewing the evidence in the light most favorable to Plaintiffs, it appears that Defendants (1) entered Tina Cortez's home in the middle of the night without consent, a warrant or exigent circumstances; (2) physically separated Tina Cortez from her telephone; (3) took her by the arm; (4) escorted her from her home; (5) took the keys to her home and locked the door, and (6) placed her in the locked back seat of a patrol car. Tina Cortez has alleged no physical injury based on Defendants' use of force against her. Like her husband Rick, she has provided an

affidavit that she was intimidated by the circumstances and the officers' show of force. Aplt. App. at 90.

As we discussed above, when Plaintiffs' allegations are taken as true, Tina Cortez was subjected to an investigative detention. Because Plaintiff's allegations suggest the investigative detention was not justified, we held that Defendants are not entitled to qualified immunity on Plaintiffs' claim that Tina Cortez was seized unreasonably.

For purposes of qualified immunity, we have little doubt that Tina Cortez has alleged a constitutional violation concerning excessive force that survives summary judgment. When Plaintiffs' allegations are taken as true, Plaintiffs have demonstrated that Defendants' use of force against Tina Cortez violated her Fourth and Fourteenth Amendment right to be free from the use of excessive force in the context of an investigative detention. This right was clearly established at the time of Defendants' actions.

We have recognized that, given evidence of officer safety concerns, officers may in appropriate circumstances take steps to protect their personal safety and maintain the status quo during a Terry stop. Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997); Perdue, 8 F.3d at 1463. Although Terry stops are normally non-intrusive, we have indicated that law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause. Perdue, 8 F.3d at 1463. At the same time, "an unreasonable level of force transforms a Terry detention into an arrest requiring

probable cause." United States v. Shareef, 100 F.3d 1491, 1507 (10th Cir. 1996); see also Florida v. Royer, 460 U.S. 491, 499 (1983) (plurality op.).

Keeping in mind that Tina Cortez was never the target of the investigation, no evidence suggests that a reasonable law enforcement officer would suspect that she posed a threat. See Melendez-Garcia, 28 F.3d at 1052-53. She was unarmed and gave no indication of flight. Though she was attempting to make a telephone call when an officer physically separated her from her telephone, she did not resist and was escorted to the locked patrol car where interrogation commenced. Again, no evidence suggests that this level of intrusiveness was warranted for officer safety concerns.

Defendants assert that if they had left Tina Cortez in her home alone, she could have destroyed evidence, but again they have provided no particularized facts to support this allegation. See United States v. Acosta-Colon, 157 F.3d 9, 17 (1st Cir. 1998). This is not a situation where officers needed to neutralize certain persons while conducting an investigation. See Shareef, 100 F.3d at 1507. Simply because Tina Cortez was seized does not mean that the force used in effecting the seizure was excessive. Rather, viewing the facts in the light most favorable to Tina Cortez, the level of force the defendants used against her was unreasonable in relation to the threat that she presented and the surrounding circumstances. Although it is generally permissible to hold a person by the arm during an investigative detention, the Defendants have not articulated any reasonable safety concerns or flight concerns that would justify the extra force that they used against

-39-

Tina Cortez – escorting her from her bedroom in the middle of the night and keeping her in a locked patrol car for nearly an hour.

We also hold that the law was clearly established. With respect to Mrs. Cortez, the officers involved should have known that they were permitted to use only as much force as was necessary to secure their own safety and maintain the status quo. See United States v. Hensley, 469 U.S. 221, 235 (1985) (officer is authorized to take such steps as necessary to protect personal safety and maintain status quo). The force used in this case bears no relationship to those purposes. Under prior case law in the Tenth Circuit, officers are required to articulate specific justifications for uses of force during an investigative detention, such as locking a person in a police car. See, e.g., Melendez-Garcia, 28 F.3d at 1052-53; Perdue, 8 F.3d at 1464. Moreover, we recently made it clear that personal security and individual dignity interests, particularly of non-suspects, should also be considered.[26] Holland, 268 F.3d at 1195.

Although Holland was decided a few months after the events in this case, it relied upon Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), as do we. There, the Court held that the plaintiff could recover money damages for injuries based upon Fourth

_____

[26] Referencing the tort of intentional infliction of emotional distress, Judge Gorsuch's concurring and dissenting opinion appears to require egregious force or severe injury, physical or not. C&D Op. at 24 n.16 (Gorsuch, J. concurring in part and dissenting in part). Such an approach is inconsistent with the Fourth Amendment's protection of "liberty, property and privacy interests–a person's 'sense of security' and individual dignity." Holland, 268 F.3d at 1195. Moreover, it would conflict with Holland which required a totality of the circumstances approach to excessive force claims and went so far as to indicate that verbal abuse (while not stating a claim in and of itself) could be considered as part of the totality of the circumstances. Id. at 1194.

Amendment violations by federal officials.  Id. at 397.  Those injuries included those

attendant to an excessive force claim where the plaintiff claimed "humiliation,

embarrassment, and mental suffering" occasioned by a warrantless arrest without

probable cause and excessive force.  Id. at 389-90.  In pertinent part, the plaintiff alleged

that he was arrested in front of his family and the entire family was threatened with an

arrest.  Id. at 389.  Physical contact is not required for an excessive force claim–patently

unreasonable conduct is.[27]  Martin, 909 F.2d at 406.  Though several prior cases finding

excessive force have involved pointing guns and handcuffing bystanders for brief periods

of time in the process of executing warrants or searches,  Holland, 268 F.3d at 1192,

Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995), McDonald v. Haskins, 966

F.2d 292, 294-295 (7th Cir. 1992), here there was no warrant or authority to search, let

alone to force Tina Cortez out of her house in the middle of the night, to take her keys,

and to hold her against her will for an hour in a locked patrol car–even if one of the

officers allowed her to use his phone to communicate with the outside world.

Considering the factors as a whole in the light most favorable to the Plaintiffs, there was a

substantial and unjustified invasion of Tina Cortez's personal security that hardly can be

---

[27]  Thus, we reject the notion that this case is about an otherwise reasonable detention that could have been conducted in a less intrusive manner.  C&D Op. at 19-20 (Gorsuch, J., concurring and dissenting).  The manner of this investigative detention simply was not within the necessary range of reasonableness.  See Melendez-Garcia, 28 F.3d at 1052-53.

considered de minimis.  See Baker, 50 F.3d at 1193 (evaluating all factors including the length of detention).[28]

## IV.    Claims Against Defendant Bowdich

Finally, the Defendants maintain that the Plaintiffs have no evidence to support a claim against Defendant Bowdich for his supervision of Defendant Gonzales and therefore summary judgment should have been granted for Defendant Bowdich.  The Plaintiffs contend that the district court was correct in applying Fed. R. Civ. P. 56(f), which states, "[s]hould it appear from the affidavits of [the nonmoving party] that the party cannot . . . present by affidavit facts essential to justify the party's opposition, the court may refuse . . . judgment or may order continuance to permit . . . discovery."

The standard of review, despite the Defendants' assertion to the contrary, is abuse of discretion.  See Guthrie v. Sawyer, 970 F.2d 733, 738 (10th Cir. 1992); Pasternak v. Lear Petroleum Exploration, Inc., 790 F.2d 828, 833 (10th Cir. 1986); Weir v. Anaconda Co., 773 F.2d 1073, 1081 (10th Cir. 1985).  The Defendants assert that the mere

---

[28] The concurring and dissenting opinion of Judge Gorsuch reduces Tina Cortez's claim to one where she seeks compensation based only on "a transient feeling of intimidation during an investigative detention,"one not involving physical abuse or a display of animus against her.  C&D Op. at 23, 22 (Gorsuch, J., concurring in part and dissenting in part).  This is too narrow.  Suffice it to say, the undisputed and objective facts of this case (when viewed in the light most favorable to the Plaintiffs, not the Defendants) are sufficient for a jury to find actual injury that is not de minimis given the interests protected by the Fourth Amendment and the course of events described by the Plaintiffs.  The concurring and dissenting opinion simply disregards the emotional or psychological injury that a jury might find resulting from intimidation, fear for personal safety, loss of liberty and privacy, associated with being removed from the residence in the middle of the night, escorted to a police car, and locked therein for over an hour.

declaration that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable is not enough to invoke Rule 56(f). See Pasternak, 790 F.2d at 832. This is true, albeit irrelevant. In Pasternak, no party filed an affidavit or notified the court of any necessity of conducting additional discovery. Furthermore, and most importantly, in Pasternak the court did not stay discovery. In the present case, the district court ruled that the Plaintiffs "made a meritorious showing under Fed. R. Civ. P. 56(f)" and "[f]urther, discovery has been stayed pending a ruling on the other individual County Defendants' claims . . . thereby precluding Plaintiffs from conducting necessary discovery." Aplt. App. 169-70. Clearly, this is not a case involving a 'mere assertion' of incomplete discovery. Consequently, we are unable to find that the district court abused its discretion in denying the motion without prejudice.

## V. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's denial of the motion for partial summary judgment on based on qualified immunity as to Plaintiff Rick Cortez's claim of an unlawful seizure (arrest), but **REVERSE** as to his claim of excessive force in connection with such an arrest. We **AFFIRM** the district court's denial of qualified immunity as to Tina Cortez as set forth above. The case is remanded for further proceedings consistent with this Opinion.

04-2062, *Cortez v. McCauley*

**HARTZ**, Circuit Judge, concurring in part and dissenting in part, joined by **O'BRIEN**, Circuit Judge.

Given the framework that the opinions in this case adopt in addressing the issues, I agree with much of Judge Kelly's opinion; but to the extent that Judge Gorsuch dissents, I find his arguments persuasive and join his opinion. I write separately, however, because of my discomfort with the framework, which requires consideration of multiple distinct causes of action arising out of a single seizure. I propose a simpler alternative. I also question our leaving issues of Constitutional law to the jury and propose bifurcated trials (under either the majority's framework or my proposed alternative) to avoid this abrogation of judicial responsibility.

In my view the majority's framework overcomplicates the analysis of Fourth Amendment unlawful-seizure claims and is likely to confuse juries, to the detriment of justice for both parties. Under the framework (what I will call the pigeonhole framework), at least as I understand it, to analyze a claim arising out of a seizure of a person, we must consider at least four distinct causes of action: (1) for an unlawful investigative detention, (2) for the use of excessive force in an investigative detention, (3) for an unlawful arrest, and (4) for the use of excessive force in an arrest. This framework requires making potentially difficult determinations that do not (or at least should not) have any practical consequences, risks double counting damages, and may undercompensate victims of unlawful seizures.

We would do better simply to recognize one cause of action (what I will call the unified cause of action): a claim for invasion of Fourth Amendment rights of the person. Disposing of the claim would require only one three-step process for all allegations arising out of seizures of the person. First, determine what information was acquired by the law-enforcement officers and when it was acquired. Second, determine what action by the officers (detention, handcuffing, etc.) was justified by their information. Third, assess damages for any action not justified by the information.

One advantage of recognizing a unified cause of action is that it can eliminate the need to make the often-unnecessary determination of the line between an investigative detention and an arrest. Under the pigeonhole framework it is always necessary to decide whether a seizure was an investigative detention or an arrest. This may be particularly important if the plaintiff questions an officer's use of force. Say, the officer had reasonable suspicion but not probable cause and the force used exceeded that permitted for an investigative detention. Under the pigeonhole framework there are three possibilities: (1) If the seizure was an investigative detention, the victim has a claim for the use of excessive force in effecting an investigative detention. (2) If the seizure was an arrest and the force used was acceptable in effecting an arrest, then the victim has only a claim for unlawful arrest, and damages from the force used would be encompassed in the claim. (3) If the seizure was an arrest and the force used exceeded what would be acceptable in effecting an arrest, the victim has a claim for excessive force (and could collect damages under this claim for injuries arising from that quantum of force that

-2-

exceeded what is acceptable for an arrest) plus a claim for unlawful arrest (and could collect damages for injuries arising from force used to the extent that the force would be acceptable in effecting an arrest).

Why go through all this? The victim is entitled to damages for all force used beyond what was proper for an investigative detention. Under the unified cause of action, it is necessary only to determine what that excessive force was and assess damages for it. In contrast, under the pigeonhole framework it is also necessary to determine whether there was an arrest and, if so, how much force would have been proper for a (totally hypothetical) lawful arrest. That additional effort accomplishes nothing. And dividing up the measurement of excessive force (between what would have been proper for a lawful arrest and what would have been excessive for such an arrest) creates an unnecessary risk of jury error, either in double counting or undercounting damages caused by the force.

This additional effort is not trivial. For one thing, it is not so easy to decide whether a seizure is an arrest or just an investigative detention. The Supreme Court has indicated that taking someone involuntarily to the station house should be considered an arrest, *see Hayes v. Florida*, 470 U.S. 811, 815–16 (1985); but it has provided little if any guidance regarding the characterization of on-the-scene seizures. And lower-court decisions are not much more help: Ordinarily there is no need to determine the line between an investigative detention and an arrest; the typical case asks only whether officers who lacked probable cause had conducted an unlawful investigative detention by extending it too long or using excessive force.

-3-

To be sure, some of our cases, and some language in the majority opinion, suggest that when an investigative detention goes bad it becomes an arrest. *See* Maj. Op. at 9 ("The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." (brackets and internal quotation marks omitted)); *id.* at 38–39 ("'[A]n unreasonable level of force transforms [an investigative] detention into an arrest requiring probable cause.'" (quoting *United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir. 1996))). But it is not at all clear why this should be so. Why can't an investigative detention that lasts too long or employs too much force simply be called an unlawful investigative detention? Indeed, if any excessive use of force converts an investigative detention into an arrest, then there could never be a claim for excessive force in effecting an investigative detention. (The claim would always become one for unlawful arrest or for excessive force in effecting an arrest.) And what about an investigative detention that lasts too long? Consider an officer's detention of a vehicle for three hours to await a drug-detection dog. We might well say that the detention could not be justified by mere reasonable suspicion. But it strikes me as strange to say that when the timer hit, say, 50 minutes, the investigative detention became an arrest. It does less violence to the English language just to declare that the investigative detention became an unlawful investigative detention. (By the way, the Fourth Amendment speaks of "seizures," not "arrests"; so there is no need to strain our terminology to fit Constitutional language.)

As I understand the law, we need only decide whether action would be justified by reasonable suspicion, by probable cause, or by neither, rather than precisely defining what an arrest is. Justice White's plurality opinion in *Florida v. Royer*, 460 U.S. 491 (1983) is suggestive. First, it said that "*Terry* [*v. Ohio*, 392 U.S. 1 (1968)] and its progeny . . . created only limited exceptions to the general rule that seizures of the person require probable cause to arrest." *Royer*, 460 U.S. at 499. This language indicates to me that the dichotomy is between *Terry* stops and seizures requiring probable cause, rather than between *Terry* stops and arrests. Reinforcing this view is Justice White's statement of the opinion's holding: "We have concluded . . . that at the time Royer produced the key to his suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." *Id*. at 502. In other words, the seizure was not within the confines of *Terry*, so probable cause was required. Although the opinion later notes that "[a]s a practical matter, Royer was under arrest," *id*. at 503, that does not appear to be a necessary condition of the holding.

My final concern with the pigeonhole framework is that it may lead to undercompensation of plaintiffs. By requiring claims to fit within a rigid framework, meritorious claims may be slighted. The injuries resulting from an unconstitutional seizure are not limited to those arising from detention in itself and from the use of force. There may also be dignitary insults, such as being publicly branded a criminal or by being exposed to public view in one's underwear. Surely damages should be permitted for such injuries arising from an unlawful seizure. But the majority opinion's unpersuasive effort

to affirm an excessive-force claim for Mrs. Cortez makes me wonder whether another court would deprive her of dignitary damages because they did not fit in a previously recognized pigeonhole.

To repeat, the framework for deciding cases under a unified cause of action would require: first, fact-finding regarding what grounds the officers had for their action; next, a legal determination whether the officers had probable cause or reasonable suspicion and what acts by the officers were permissible; and finally, fact-finding regarding whether the officers exceeded the bounds of permissible conduct and, if so, the damages, compensatory and punitive, for which they are liable. One issue that arises under both the pigeonhole framework and this framework is what the procedure should be for the second step, the determination (from the historical facts) whether the officers had probable cause or reasonable suspicion. Because I believe that this determination is a duty of the court, even though the jury may have to resolve disputed questions of historical fact, I would suggest that the most sensible approach may be to bifurcate the trial between (1) an initial trial session after which the jury answers special interrogatories regarding what information was known to the officers and (2) a second session after which the jury decides what the officers did and the amount of damages, if any, to which the plaintiff is entitled. In the intermediate stage between the two trial sessions, the trial judge must decide, based on the findings of historical fact by the jury at the initial session, what alleged conduct would be unlawful—or, if a defendant claims qualified immunity, what alleged action would be clearly established as unlawful.

I recognize that our precedents hold that the issue of probable cause or reasonable suspicion is for the jury when the historical facts are disputed. *See DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990). But when the historical facts are undisputed, we should not leave to the jury to determine whether those facts establish probable cause or reasonable suspicion. *See Bell v. Irwin*, 321 F.3d 637, 641 (7th Cir. 2003). And it strikes me as peculiar for us to defer to the jury's resolution of probable cause when the historical facts are disputed while we do not defer to the trial judge in the same circumstances, *see United States v. Dozal*, 173 F.3d 787, 792 (10th Cir. 1999) ("We review the legal issue of probable cause de novo."). Our only deference to the trial judge is in the findings of historical fact, not the determination whether the found facts establish probable cause or reasonable suspicion. *See id.* Of course, the judge can instruct the jury on the meaning of probable cause or reasonable suspicion, but the judge cannot fully inform the jury of the body of law that informs our decisions on these matters. The only acceptable alternative I can see to a bifurcated trial is for the jury instructions to provide what amounts to a chart that tells what result (regarding the existence of probable cause or reasonable suspicion) the jury should reach if it finds particular facts. Perhaps that would be a workable approach when there are only one or two material disputed facts.

Turning to the case at hand, applying the unified framework would simplify the analysis a good deal. The historical facts are undisputed. With respect to Mr. Cortez, the first step would then be to determine whether the law was clearly established that the officers lacked probable cause to arrest him. If, as Judge Gorsuch reasons, the law was

-7-

not clearly established, then Mr. Cortez's detention, including the officers' use of force against him, would not be grounds for liability of the individual officers.  If, on the other hand, as Judge Kelly reasons, the officers clearly lacked probable cause, the next step would be to decide whether they had reasonable suspicion.  The full court seems to agree that there was reasonable suspicion, so the issue becomes whether the law was clearly established that some of the officers' actions against Mr. Cortez—ranging from the use of force to extending the detention beyond, say, 30 minutes—could not be justified by mere reasonable suspicion.  (I note that the majority opinion appears to assume that the *entire* seizure of Mr. Cortez was unlawful because it was an arrest.  But since the conclusion that it was an arrest is based, at least in part, on events that occurred after the initial seizure (such as the duration of the detention), perhaps damages did not begin to accrue immediately.)  The jury could then assess damages for any such actions.

For Mrs. Cortez the officers clearly lacked even reasonable suspicion.  Therefore, she would be entitled to damages for all that the officers did to her.  There would be no need to decide whether the force was more than permitted for a lawful investigative detention or lawful arrest, nor would there be a need to apportion damages between two or more claims.  All would be subsumed in one Fourth Amendment claim.

Perhaps this approach is what the panel opinion was moving toward.  But rather than speaking of an excessive-force claim being subsumed in an unlawful-arrest claim, or some similar formulation, I think the matter is clarified by eliminating all subcategories and speaking only of a Fourth Amendment claim.

04-2062, *Cortez v. McCauley*

**McCONNELL**, J., concurring in part and dissenting in part.

I agree with the majority (and Judge Gorsuch) that the defendant officers did not have probable cause to arrest Rick Cortez. In reaching this conclusion, I place particular emphasis on the fact that the officers did not speak with or even observe the child victim, did not speak with the child's mother, who had reported the child's statement, and therefore had no way to evaluate her credibility, and did not have any medical or other corroborating evidence; that the child's statement, as reported, was ambiguous and not necessarily a charge of sexual assault; and that the child was barely old enough to know how to speak. It is also significant that the officers had no reason to act in so precipitous a manner. Medical evidence would soon be forthcoming, and there was no evident danger of injury to other persons or of flight.

I agree with Judge Gorsuch, however, that this principle was not clearly established at the time of the arrest, and join Part Ib of his opinion.

I also agree with the majority (and Judge Gorsuch) that Rick Cortez has not stated a claim for excessive force. I join Parts III-A and III-B of the majority opinion.

I agree with the majority (and Judge Gorsuch) that the investigatory detention of Tina Cortez violated the Fourth Amendment and that this violation was based on clearly established law, and join Part I-C of the majority opinion.

I also agree with the majority that the force used to effectuate Mrs. Cortez's detention was excessive and that this, too, was clearly established. In a case where the

plaintiff alleges both an unreasonable seizure and excessive force, the proper inquiry for the excessive force claim is whether the officers used greater force than would have been reasonably necessary to effect a lawful seizure. Maj. Op. 33 & n.23.[1] Thus, the question here is whether, if (contrary to fact) the officers had possessed reasonable suspicion sufficient to detain Mrs. Cortez, they would have been entitled to break into her home in the middle of the night without warrant, probable cause, or exigent circumstances, go to her bedroom, force her to terminate a telephone call, grab her by the arm, take her keys and lock the door to her home, and detain her in a locked police vehicle – in spite of the fact that she was not suspected of any crime and posed no threat to the officers or to anyone else. I agree with the majority that the answer is: no. Whatever actions might have been appropriate if the officers had encountered Mrs. Cortez in a location where they had a lawful right to be present, it is clearly established that mere reasonable suspicion is not sufficient to break into a person's home and force her into a patrol car. *See Payton v. New York*, 445 U.S. 573, 590 (1980); *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002). With that difference of emphasis, I join Part III-C of the majority opinion.

---

[1]Judge Gorsuch argues that the entry into the Cortez home should not be treated as part of the force used to effectuate her seizure. Op. at 17 n.14 (Gorsuch, J. concurring in part and dissenting in part). I do not see why not. For purpose of the excessive force analysis, we ask whether the type and degree of force employed to effectuate a detention would have been reasonable if the detention were justified. Even if the officers in this case had had reasonable suspicion, sufficient to seize Mrs. Cortez for investigative detention, they would not have had authority to enter the home. The entry is therefore properly an element in her excessive force claim. Contrary to Judge Gorsuch, this does not lead to "double-counting of damages" any more than in an ordinary tort suit where a single act is relevant to more than one cause of action.

In all other respects, I join the majority opinion.

04-2062, *Cortez v. McCauley*

**GORSUCH**, Circuit Judge, concurring in part and dissenting in part, joined by **HARTZ**, **O'BRIEN**, **TYMKOVICH**, and **HOLMES**, Circuit Judges, and joined in Part I.b by **McCONNELL**, Circuit Judge.

The narrow issue that moved us to grant en banc review was the panel's assertion that when a case contains claims for both an unlawful seizure and excessive force arising under the Fourth Amendment, the latter claim must always be subsumed within and resolved in like fashion as the former claim. *See* Order, *Cortez v. McCauley*, No. 04-2062, at 2 (10th Cir. May 4, 2006) (unpub.). After sweeping aside the panel's proffered rule, the majority proceeds to devote the bulk of its efforts to the task of applying more or less settled Fourth Amendment legal principles to the facts of this particular case. While I agree with much of the Court's analysis, in certain respects I regret that I am unable to do so.

First, the majority finds that no probable cause existed to support the defendants' arrest of Mr. Cortez; while I concur with the result the majority reaches on this score, I cannot entirely agree with all of the reasoning the majority appears to employ. Second, the majority denies qualified immunity on Mr. Cortez's seizure claim but fails to cite authority which, I believe, reasonably could have provided notice to law enforcement officers of the illegality of their actions. Third, the majority's analysis of Ms. Cortez's excessive force claim – relying solely on her detention and temporary feeling of intimidation – is without precedent in our case law and seems to suggest that nearly any unlawful seizure may now give rise to an unlawful use of force claim in our circuit.

I

When a defendant asserts qualified immunity at summary judgment, the plaintiff must clear two hurdles. First, he or she must demonstrate that the defendant violated a constitutional or statutory right of the plaintiff. Second, the plaintiff must also show that the infringed right at issue was sufficiently clearly established at the time of the allegedly unlawful activity that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). In undertaking this analysis, the Court has repeatedly warned us against "unrealistic second-guessing" of police judgments, *United States v. Sharpe*, 470 U.S. 675, 686 (1985), and has instructed us to proceed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking account of "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989). In my view, the majority errs in certain respects at both steps of the *Saucier* analysis of Mr. Cortez's unlawful detention claim.

a.      Today, the majority announces a new rule of law at *Saucier*'s first step – namely, that a statement of a two-year-old victim identifying the perpetrator of a sexual assault, at least when transmitted through third parties, is insufficient to supply probable cause for an arrest. While one could question the wisdom of such a rule,[2] I do not

---

[2]  *See generally United States v. Shaw*, 464 F.3d 615, 634 (6th Cir. 2006) (Sutton, J., dissenting) ("In murder and rape cases, . . . [e]yewitness testimony alone will suffice . . . . To say

(continued...)

disagree with the result the majority reaches. This case differs from our decision in *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985), in important respects: here, there was only one victim and therefore no corroboration from two different accounts; the child was younger, indeed barely past the age of language acquisition; and the statement that Mr. Cortez "hurt [the child's] pee pee" was ambiguous in that, while it certainly could suggest sexual abuse, it also was susceptible to a sexually-neutral application. For these reasons, I accept the majority's conclusion, Maj. Op. at 11-12, that, under the totality of the circumstances, there was no probable cause for Mr. Cortez's arrest.

After announcing its conclusion on this score, however, the majority broadens its critique of the quantity and quality of the evidence before the officers later in its opinion, Maj. Op. at 12-23; while written primarily in the context of *Saucier* step two, the analysis in this portion of the Court's opinion appears to inform its conclusion at *Saucier* step one as well. But whether most pertinent to *Saucier* step one or step two (or perhaps both), I find certain aspects of the majority's discussion problematic and am thus unable to join this portion of the Court's opinion.

First, the majority enumerates a laundry list of things the officers might have done, but did not do, to corroborate the child's statement in this case. Maj. Op. at 13. Indeed,

---

[2](...continued)
that child-sexual-abuse cases require corroborating evidence thus not only *increases* the Fourth Amendment protections for this one crime but does so for the one type of crime most likely *not to* yield such evidence.").

the majority summarizes its complaint with the officers's conduct as involving "a need for more pre-arrest investigation." Maj. Op. at 11. While I do not doubt for a moment that additional investigation would have been a good idea, asking whether the officers might've, could've, or should've done more investigation before effecting an arrest is not the test for evaluating whether probable cause existed at the time of the arrest. We have never previously imposed upon officers a duty to investigate certain leads we think, in retrospect and with the benefit of hindsight, might have been warranted or wise before making an arrest. Rather, precedent instructs us to examine what the officers *actually did*, asking whether, on the facts they had before them, probable cause was or was not present. *See, e.g., Graham*, 490 U.S. at 396. As we put the point in *United States v. Gordon*, "[t]o determine if probable cause existed for a warrantless arrest, we examine if, *at the time of arrest, the facts and circumstances within the officer's knowledge* and of which the officer had reasonably trustworthy information *were sufficient to warrant a prudent officer in believing the defendant had committed or was committing a crime*." 173 F.3d 761, 766 (10th Cir. 1999) (emphases added).[3] The majority's hypothesizing

---

[3] Indeed, the law books are replete with cases indicating that the fact that officers might have conducted a more thorough investigation does not negate the existence of probable cause. *See, e.g.*, *McKinney v. Richland County Sheriff's Dept.*, 431 F.3d 415, 418-19 (4th Cir. 2005) ("The fact that [the officer] did not conduct a more thorough investigation before seeking the arrest warrant does not negate the probable cause established by the victim's identification."); *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2nd Cir. 2001) ("We observed that once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest. Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong

(continued...)

about what the officers could have done, or what type of investigation they should have undertaken seems to me to be the very type of second-guessing that the Supreme Court has repeatedly cautioned us against. *See supra* p. 2.[4]

Second, the majority stresses that the putative victim's statement identifying Mr. Cortez as the perpetrator did not come directly from the child, but through a hospital official to whom the alleged victim's mother had conveyed the statement. The majority goes so far as to say that it would be "patently obvious" to any reasonable officer that "unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause." Maj. Op. at 14-15. But, while in some places the majority criticizes the officers' reliance on hearsay, in others the majority asserts that "[t]he fact that hearsay evidence would not be admissible at trial to prove guilt does not make it unusable as a source of probable cause for a warrantless arrest." *Id.* at 13-14.

---

[3](...continued)
before arresting him." (internal alteration and quotation omitted)); *Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) ("The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation.").

[4] The majority cites to *United States v. Valenzuela*, 365 F.3d 892, 902 (10th Cir. 2004), Maj. Op. at 11, as authority for its contrary view. But *Valenzuela* simply held that probable cause did not exist based on the totality of the circumstances in that case. *Id.* at 901. While the court eventually proceeded to observe that the officers "failed to fully investigate the facts" before arresting the defendant, that comment came in *dicta* as part of a final incredulous observation that "none of the agents ever even asked" the defendant whether she was with the driver of the vehicle carrying drugs. *Id.* It certainly is not the case that *Valenzuela*, which spent pages explaining why the officers had no probable cause under the totality of the circumstances, supports the proposition that probable cause does not exist because the officers failed to investigate in ways judges coming to the case after the fact think most effective or sound; indeed, it did not even address *Graham*, *Gordon*, or any other authority (some of which is cited in note 2, *supra*) indicating otherwise.

-5-

And, in fact, the courtroom's refined rules of evidence have never governed hardscrabble investigative police work occurring in real time. To the contrary, the law has always been that an arresting officer *may* rely on hearsay, even multiple layers of hearsay, in establishing probable cause when the hearsay has some indicia of reliability. *See United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004) ("We restate that multiple layers of hearsay may form the basis of a finding of probable cause."); *United States v. Monaco*, 700 F.2d 577, 580 (10th Cir. 1983) ("A search warrant can be predicated upon an affidavit containing direct observations of police officers or hearsay from a reliable source or informant."); *see also United States v. Corral*, 970 F.2d 719, 727 (10th Cir. 1992).

Third, the majority characterizes the police as having no facts before them supporting the reliability of the child's hearsay complaint at the time of Mr. Cortez's arrest. Maj. Op. at 13-17. But this simply isn't so. The officers had a mother – the one person in the world who we can reasonably assume best knew the child – acting in a manner suggesting that she believed a crime had occurred: she, along with the child's godfather, took the child to the hospital for an extraordinary, middle-of-the-night pelvic exam. *See* Appellants' App. at 55, 58, 99.[5] The officers also knew that hospital

---

[5] Of course, the officers learned later of a possible grudge between Ms. Cortez and the child's mother, and this fact understandably troubles the majority. But this information came to the officers only *after* Mr. Cortez was seized and thus cannot inform the question whether the officers had probable cause *at the time* of the seizure, a question we must analyze based on the information the police had at the time of the arrest and not on facts learned later with the benefit of hindsight. *See supra* p. 2. (Notably, the officers released Mr. Cortez as soon as they received

(continued...)

-6-

authorities had reported the child's allegations pursuant to their duty to disclose incidents of suspected child abuse. *See id.*; N.M. Stat. § 32A-4-3(A) ("Every person . . . who *knows or has reasonable suspicion* that a child is an abused or a neglected child shall report the matter immediately to . . . a local law enforcement agency. . . ." (emphasis added)). And the officers knew, as the majority concedes, that they were "investigating a serious felony" and needed to take "quick action to separate the accused from any other children that might be in the home." *See* Maj. Op. at 35. Indeed, New Mexico law *required* the police to take immediate action on receipt of a child abuse claim, thus placing the officers in something of a Catch-22: wait for more evidence and risk violating state law or act quickly and risk a federal lawsuit. *See* N.M. Stat. § 32A-4-3(C) ("The recipient of a report under Subsection A of this section shall take *immediate steps* to ensure *prompt investigation* of the report. The investigation shall ensure that *immediate steps are taken* to protect the health or welfare of the alleged abused or neglected child, *as well as that of any other child under the same care* who may be in danger of abuse or neglect." (emphases added)). Finally, the description the child offered of the event (alleging that Mr. Cortez "hurt her pee pee," *see* Appellants' App. at 58), could be consistent with (even if not exclusively determinative of) how a young child would perceive and report a sexual assault.[6]

---

[5](...continued)
information calling into question the accuracy of the child's statement.)

[6] *See Shaw*, 464 F.3d at 632 (Sutton, J., dissenting) (quoting Josephine A. Bulkley, *The*

(continued...)

Thus, while I agree that the arrest of Mr. Cortez lacked probable cause, I do so for the limited reasons stated above and am unable to join the majority's reasoning.

b.    With regard to the majority's conclusion at the second step of *Saucier*, I feel compelled to dissent.  The qualified immunity doctrine embodied in this portion of the *Saucier* analysis is intended to protect diligent law enforcement officers, in appropriate cases, from the whipsaw of tort lawsuits seeking money damages arising from their conduct effectuating their sworn obligation to intervene in aid of public safety, often on a moment's notice with little opportunity for reflection and based on incomplete information.  *See supra* p. 2.  Before a law enforcement officer may be held financially liable, the Supreme Court requires a plaintiff to establish not only that his or her rights were violated but also that those rights were "sufficiently clear that a reasonable official would understand that what he is doing violates th[em]."  *Saucier*, 533 U.S. at 202; *supra* p. 2.  *See also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity should protect "all but the plainly incompetent or those who knowingly violate the law").  Accordingly, we have held that, in order for liability to be imposed, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

---

[6](...continued)
*Impact of New Child Witness Research on Sexual Abuse Prosecutions*, in Perspectives on Children's Testimony 208, 226 (S.J. Ceci ed., 1989) ("Studies indicate that in many cases of sexual abuse, younger children's honesty combined with lack of cognitive abilities may make them more credible witnesses.") and quoting Joyce A. Adams, *The Role of the Medical Evaluation in Suspected Child Abuse*, in True and False Allegations of Child Sexual Abuse 231, 239 (Tara Ney ed., 1995) ("[T]he child's statement is the most important evidence of molestation. . . .  [T]he results of the medical examination will usually be normal or nonspecific . . . the medical examination will rarely be diagnostic of sexual abuse.")).

authority from other courts must have found the law to be as the plaintiff maintains."

*Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

The opinion for the Court fails to adhere fully to these principles. What exactly would have put the officers on clear notice that relying on a two-year-old's statement to support the arrest of Mr. Cortez was impermissible? Previously, we have held that when a victim of a crime identifies the perpetrator, police may rely on that information, standing alone, to supply probable cause for an arrest unless they have some reason to think that the statement was not trustworthy. *See Easton*, 776 F.2d at 1449.[7] This traditional rule plays a particularly vital role in the context of sexual assaults on children as the child victim is usually the *only* person with knowledge of the assault. *See id.* (noting that it is "entirely unacceptable" to presume child sexual abuse victim statements to be unreliable and that "[i]n a great many child molestation cases, the only available evidence that a crime has been committed is the testimony of children"); *cf. Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988) (upholding probable cause for a detention based on the uncorroborated statement of ten-year-old victim (and only witness) of an

---

[7] *See also Curley*, 268 F.3d at 70 ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." (internal citations omitted)); *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker. Indeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself." (internal citation omitted)); *Clay v. Conlee*, 815 F.2d 1164, 1168 (8th Cir. 1987) (collecting cases).

alleged theft and noting that "[t]en-year-olds are capable of being more truthful than some adults").

To be sure, as I have acknowledged, *Easton* can be distinguished from the facts at hand, and I agree with the majority that the probable cause calculus in this case ultimately and properly ends in a different result than the one reached in *Easton*. *See supra* p. 3. But I can hardly blame law enforcement officers for having failed to divine our outcome on that score while busy responding to a call reporting an alleged child molestation. In *Easton,* we held that even at-times inconsistent victim statements of a three-year-old and a five-year-old regarding a sexual assault were sufficient to provide the officers in that case with probable cause for an arrest. 776 F.2d at 1449-50. A reasonable officer quite easily could have concluded from this holding and the background law concerning victim statements generally that a statement emanating from the victim of an alleged sexual assault, with little more, is sufficient to supply probable cause. The *Easton* panel itself expressly noted that the police officers "had probable cause at [the] time" they completed their interviews with the victims, and thus did not need to await the results of any additional investigation before making an arrest. *Id*. at 1451. It is a whipsaw indeed to move from this conclusion in *Easton* to the conclusion the Court offers today at *Saucier* step two – that *any* reasonable officer *clearly should have known* from our case law that an arrest based solely on the statement of a two-year-old victim was illegal.[8]

_____

[8] The majority charges that such a reading of *Easton* is possible "only if the facts of cases do not matter." Maj. Op. at 21. But of course the facts of *Easton* matter greatly and,

(continued...)

To support its conclusion at *Saucier* step two, the majority advances a number of arguments discussed already which I find unpersuasive whether best directed at step one or, as it submits, step two of the *Saucier* sequence. *See supra* pp. 4-8. The majority then proceeds to identify authority that, it asserts, put the officers on clear notice of the illegality of their conduct. It begins this latter discussion, however, with what amounts to a rather telling admission: "Even without prior caselaw on point . . . we would harbor no qualms concluding, based solely on cases like [*Tennessee v.*] *Garner*[, 471 U.S. 1 (1985),] and [*United States v.*] *Watson*[, 423 U.S. 411 (1976)], that the officers were on reasonable notice that their actions ran afoul of the Fourth Amendment." Maj. Op. at 15. Beginning with a disclaimer about the *absence* of case law seems to indicate that there *isn't* any "prior caselaw on point" clearly notifying officers that their conduct was wrongful; citing *Garner* and *Watson* only serves to confirm that conclusion. Both are old chestnuts holding simply that probable cause is required to effectuate a lawful arrest. Suggesting that they somehow put officers on notice that their conduct in this case was improper falls squarely into a trap the Supreme Court has warned us against: relying on

---

[8](...continued)
indeed, they inform our analysis and result at *Saucier* step one in deciding whether probable cause existed for the arrest. But the question at *Saucier* step two is different: here we are required to ask not how *Easton* is *best* read and applied to the case at hand, but whether it *clearly precluded*, from a reasonable officer's point of view, the course of conduct taken by law enforcement in this case. My point on this score is simply that, while *Easton* is not *best* read to support probable cause in this case, neither did it *clearly preclude* the officers' apparent view that a victim's hearsay statement – together with certain corroborating facts, *see supra* pp. 7-8 – was sufficient to establish probable cause. Recognizing that "[o]ur cases *suggest*" a particular result, Maj. Op. at 22 (emphasis added), simply is not enough at *Saucier* step two.

sweeping and generic pronouncements of the law instead of identifying prior authority fairly putting officers on notice that their actions were illegal. *See generally Brousseau v. Haugen*, 543 U.S. 194, 201 (2004) (holding that the court of appeals mistakenly relied on *Garner* and *Graham* in finding use of excessive force clearly established where facts fell within a "hazy border between acceptable and excessive force" (internal quotation omitted)); *id.* at 199 ("*Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality. Of course in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law. The present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." (internal citations omitted)).

Further, while the plaintiff bears the burden of citing to us what he thinks constitutes clearly established law showing the defendants' conduct was unlawful, *see Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995), Mr. Cortez refers us to only a single case – *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995) – and that case may do Mr. Cortez more harm than good. *Romero* nowhere rejected, and doesn't even discuss, our rule that the word of the victim, as reliably relayed through third parties, is typically enough to establish probable cause. *See id.* at 1476-78. Rather, *Romero* held that an officer *had* probable cause to arrest the defendant based on information provided by two individuals who were *not even witnesses* to the alleged crime, but who had seen earlier events. *Id.* at 1473-74, 1476-77. *Romero* further held that the officer was *not* required to interview the plaintiff's alleged alibi witnesses. *Id.* at 1476-77. To be sure, in *dicta* cited

-12-

by the majority, *Romero* speaks of the importance of interviewing witnesses readily available at the scene of a crime, but it doesn't talk of, let alone impose, a duty to interview witnesses located elsewhere (such as at a hospital) before making an arrest.[9]

Trying to fill the void left by plaintiff, the majority cites to *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998), and *United States v. Shaw*, 464 F.3d 615 (6th Cir. 2006). Neither does much to aid Mr. Cortez's cause. In *Baptiste*, the arresting officers based the decision to arrest an alleged shoplifter on statements made by store security guards. *See* 147 F.3d at 1256-57. Yet, before making the arrest the officers also viewed the store's video recording clearly showing the plaintiff purchasing, not shoplifting, the trinket at issue. *See id*. Rather unremarkably, we held that officers cannot expect qualified immunity for making an arrest *after* they have viewed with their own eyes a video recording showing that the plaintiff committed no crime. *Id*. at 1257. Meanwhile, *Shaw* was decided only months ago and thus could not possibly have put the defendants before us on notice of the illegality of their conduct in 2001. Moreover, *Shaw* relied heavily for its result on the now-vacated panel opinion in this case and cited nothing to suggest that, as of the time of the events in question here, it was clearly established that a two-year-old victim's statement was insufficient to support probable cause. *See* 464 F.3d

---

[9] Indeed, *Romero*'s dicta merely speaks of establishing probable cause through interviewing witnesses at the scene, investigating basic evidence, *or* otherwise inquiring if a crime has been committed, doing nothing to upset our general rule about the acceptability of relying on victim statements. Lest any doubt remain, in *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002), we subsequently clarified that "none of [the *Romero*] factors is dispositive or indeed necessary to the inquiry" into whether probable cause existed for an arrest. *Id.* at 1312.

at 625-26. Thus, neither case could have overturned long standing case law allowing police to rely on statements by victims of crime against their own persons, nor could they have imposed on police (as the majority seems to do) an obligation to investigate other leads even in the presence of such a statement.

Underscoring the absence of any authority putting the officers on clear notice of the illegality of their seizure of Mr. Cortez is the overwhelming authority establishing the illegality of Ms. Cortez's detention. Here is a genuine instance where no reasonable officer possibly could have thought his conduct was acceptable and thus protected by qualified immunity doctrine. Any good officer knows, after all, that he or she may not, as the officers did with respect to Ms. Cortez, enter the sanctum of a person's home to effect a seizure without a warrant or probable cause and the presence of exigent circumstances. The Supreme Court has expressly and for many years said exactly that. *See Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.").[10] Such clear statements from established case law are what our decisions hold are necessary before a

---

[10] Some courts have suggested that entry of the curtilage of a home, under particular circumstances, to complete a *Terry* stop that was *initiated in a public place* does not violate the Fourth Amendment. *See*, *e.g.*, *United States v. Pace*, 898 F.2d 1218, 1228-29 (7th Cir. 1990). The stop here, however, started in Ms. Cortez's home.

-14-

court may abrogate qualified immunity at *Saucier* step two; it is exactly these types of statements which, in the context of Mr. Cortez, are conspicuously missing.[11]

II

Since the Supreme Court's command in *Graham* that excessive force claims arising from a seizure are to be analyzed under the Fourth Amendment rather than through some other (*e.g.*, Fourteenth Amendment) constitutional lens, *Graham*, 490 U.S. at 394-95, the courts of appeals have struggled to define the nature and quantum of the force required to state a claim.[12] We have been instructed that "[n]ot every push or shove" should give rise to a constitutional excessive force claim, *id*. at 396 (internal quotation omitted), but have otherwise been left (at least for the time being) by the Supreme Court to our own devices to sort out the post-*Graham* legal landscape. I agree with the majority's ultimate conclusion that the mere handcuffing of Mr. Cortez – without

----

[11] To be perfectly clear, I do not mean to suggest, as the majority claims, that I would require a "case on all fours" to constitute clearly established law. *See* Maj. Op. at 22. Rather, as the majority's citation to *Lanier* puts it, what a court must do is identify case law that applies "with obvious clarity to the specific conduct in question" such that a reasonable officer would be on notice that his or her conduct was unlawful. *See* 520 U.S. at 271; *see also supra* p. 9 (collecting additional authority). It is this, I contend, Mr. Cortez and the majority fail to do. Likewise, I do not remotely suggest that, "because the allegation was made, repeated by others, and acted on by law enforcement personnel, [it] was trustworthy." Maj. Op. at 14-15 n.10. This characterization not only ignores the corroborating evidence before the officers at the time of their encounter with Mr. Cortez, it also underscores the problem with the majority's analysis. The question before us in a qualified immunity case is not what, sitting here today with the benefit of hindsight, any one of us *thinks* sufficiently trustworthy to rise to the level of probable cause. It is what extant law told reasonable police officers in 2001 about their conduct.

[12] *See generally* Jill I. Brown, Comment, *Defining "Reasonable" Police Conduct:* Graham v. Connor *and Excessive Force During Arrest*, 38 UCLA L. Rev. 1257 (1991); Daniel J. O'Connell, Note, *Excessive Force Claims: Is Significant Bodily Injury the Sine Qua Non to Proving A Fourth Amendment Violation?*, 58 Fordham L. Rev. 739 (1990).

-15-

any further allegation of injury – is insufficient to state a claim for excessive force notwithstanding the illegality of his arrest. In my view, however, the level of force used in the investigative detention of Ms. Cortez – escorting her by the arm from her house and keeping her in a locked police car for an hour with use of an officer's cell phone – also does not rise to the level of an actionable claim for excessive force under the governing case law.[13]

a. Tellingly, neither Ms. Cortez nor the majority point to a *single* case allowing an independent claim for excessive force to proceed under remotely analogous circumstances. The cases in which courts have held a non-physical injury sufficient to state a claim for excessive force typically involve the use of grave force and at least the threat of imminent and severe physical harm. For example, a panel of our Court in *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), found excessive force where, among other things, a SWAT team member in the course of a raid chased down a four-year-old girl with a high-powered firearm and a laser sight trained on her back despite the fact she posed no threat whatsoever. *See id*. at 1184, 1197. Similarly, in *Tekle ex rel. Tekle v. United States*, 457 F.3d 1088, 1095-96 (9th Cir. 2006), the court

---

[13] Judge Hartz very reasonably questions whether there ought to be separate Fourth Amendment claims for unlawful detention and the excessive use of force rather than a single Fourth Amendment claim focused on the reasonableness of police conduct, viewed as a whole. *See* Conc. & Diss. Op. at 2 (Hartz, J.). While there is much to commend that approach, for now at least that has not been the direction followed by the circuit courts; neither is it an issue I see the need to decide today given that it was not briefed to us and, *even if* viewed as an independent cause of action, I would conclude that neither of the Cortezes states a claim based on excessive force.

-16-

held that the use of handcuffs and guns pointed at a cooperative eleven-year-old boy not suspected of a crime (and who was picked up by the chain of the cuffs) were sufficient to support a jury finding of excessive force. And in *McDonald by McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992), the court held that pointing a gun at the head of a nine-year-old boy and threatening to shoot during a search of the boy's parents' apartment stated a claim for excessive force. *See also Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (holding that an excessive force claim was appropriate where a woman and her minor children approached a house where a search warrant was being carried out, had guns pointed at them, and were handcuffed for up to twenty-five minutes). The facts in the case before us do not come close to rising to the standard suggested by existing case law; indeed, we have routinely dismissed excessive force claims alleging facts far more invasive and threatening than those presented by Ms. Cortez.[14]

The majority appears to rest in some significant measure on the fact that the officers could have conducted Ms. Cortez's detention in a less intrusive manner or

_____

[14] For example, in *Wheeler v. Scarafiotti*, 85 Fed. Appx. 696 (10th Cir. 2004) (unpub.), we held that absent an allegation of "bodily or physical injury," screaming at a defendant, placing a hand near a holstered weapon, and threatening possible incarceration was not sufficient to constitute an excessive use of force. *Id.* at 699. In *Rucker v. Hampton*, 49 Fed. Appx. 806 (10th Cir. 2002) (unpub.), we held that following a suspect into his home, putting him in a headlock, and holding his arm behind his back for fifteen to twenty minutes does not constitute an excessive use of force where the suspect ignored police orders and fled into his home. *Id.* at 809-11. And, in *Chamberlain v. City of Albuquerque*, No. 92-2089, 1993 WL 96883 (10th Cir. March 29, 1993) (unpub.), we affirmed the district court's holding that keeping a suspect at gunpoint for a short period despite his raised and empty hands is not sufficient to create a viable claim for excessive force. *Id.* at *2-*3, *7-*8.

exceeded what was reasonably "necessary." *See* Maj. Op. at 39-40. But it is not the law that officers must always act in the least intrusive manner possible or employ only that force that might be deemed necessary in hindsight; indeed, we have repeatedly held otherwise, explaining that "the Fourth Amendment 'does not require police to use the least intrusive means in the course of a detention, only reasonable ones.'" *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)) (internal alteration omitted); *accord V-1 Oil Co. v. Means*, 94 F.3d 1420, 1427 (10th Cir. 1996). Here, the officers were arresting Ms. Cortez's husband in the middle of the night for a serious offense and were questioning her regarding the alleged crime. In these circumstances, the officers' actions of removing Ms. Cortez from her home in a non-violent manner and placing her in the back of a police car where she was allowed to use an officer's cell phone to contact the outside world were, though perhaps not the least intrusive means available to them, within the *range* of what would be reasonable assuming, as we must at this point, that her seizure was lawful. As such, these circumstances should not give rise to an additional and separate claim for excessive force.[15]

---

[15] While the majority does not explain why it reaches a contrary conclusion, Judge McConnell emphasizes the officers' entry into the Cortezes' home as part of the excessive force analysis. *See* Conc. & Diss. Op. at 2 (McConnell, J.). But the majority and I agree that a critical part of what made Ms. Cortez's seizure unlawful was the fact that it occurred by means of the entry into her home. *See* Maj. Op. at 24; *supra* pp. 15-16. Under the Court's virtually unanimous analysis, therefore, Ms. Cortez is entitled to recover fully and appropriately for the circumstances that rendered her seizure unlawful – including the entry that was essential to its effectuation. *See also infra* p. 25. It would be anomalous to hold the same singular fact is not

(continued...)

-18-

b.    The opinion for the Court also relies heavily on Ms. Cortez's statement that she felt "intimidated" during the course of her seizure. *See* Maj. Op. at 38. The majority appears to interpret *Holland* as holding that an individual may base an excessive force claim solely on injuries that the majority variously describes as violations of "personal security" or "dignity interests." *See id.* at 40. But *Holland* merely held that excessive force claims need not be founded exclusively on a claim of physical injury, recognizing that the circumstances of an encounter – there involving the display of deadly force against innocent children – may themselves be so outrageous as to demonstrate excessiveness. *See* 268 F.3d at 1195 ("We likewise decline to adopt a bright-line standard dictating that force cannot be [constitutionally] excessive unless it leaves visible cuts, bruises, abrasions or scars."). It was only in the context of so holding that *Holland* mentioned that "the interests protected by the Fourth Amendment are not confined to the

---

[15](...continued)

just relevant to, but the gravamen of, two independent and distinct causes of action, and doing so risks the double-counting of damages. While Judge Hartz suggests a unified Fourth Amendment claim to prevent such problems, for now we are obligated to parse the claims into two. *See supra* note 12. Nor is this just a practical problem, but an analytical one. In order to evaluate whether any *Terry* stop seizure was lawful or not we are instructed to ask not just whether the stop "was justified at its inception" by reasonable suspicion but also whether the nature of the seizure was "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. 1, 88 (1968). That is, in assessing the lawfulness or unlawfulness of a *Terry* stop, the Supreme Court has told us to consider the nature of the seizure itself, not just the question whether reasonable suspicion existed at its inception. Judge McConnell, meanwhile, seeks to use the very same (second) *Terry* factor that we must consider in determining the lawfulness of the seizure as the touchstone for his excessive force analysis. Thus, analytically, the two claims merge.

right to be secure against physical harm; they include liberty, property, and privacy interests – a person's sense of security and individual dignity." *Id*.

Even assuming *arguendo* that *Holland* held the invasion of an individual's sense-of-security or dignity interests, standing alone, may form the basis of excessive force claims, without reference to the nature of the police encounter, it does not necessarily follow, as the majority seems to imply, that any subjective feeling of intimidation qualifies as a constitutionally sufficient invasion of these interests. In fact, *Holland* itself expressly *rejected* the notion that a claim of excessive force could be based solely on intimidating or abusive language. *Id*. at 1194. In addition, like the plaintiffs in *Baker*, *McDonald*, and *Tekle*, the plaintiffs in *Holland* faced the imminent threat of deadly force and egregiously unprofessional police misconduct. *Id*. at 1192. That situation is not analogous to that of Ms. Cortez, who does nothing to suggest that the officers physically or verbally abused her, or displayed any animus towards her whatsoever. To the contrary, Ms. Cortez was permitted the sense of security that access to the outside world provides when she was allowed to use an officer's cell phone in the police car.

Finally, to the extent that *Holland* might (nonetheless) be read as holding that even a trivial physical or psychological injury is sufficient standing alone to prove a claim for excessive force, I would use this *en banc* proceeding to clarify the matter and hold that, where the facts surrounding a seizure are not themselves patently excessive (such as in *Holland* itself and other cases cited at pages 18-19, *supra*), more than a *de minimis* injury is required to suggest that the force used was excessive. That is, I do not doubt that, in

-20-

addition to pointing to the facts of the encounter itself as plaintiffs did in *Holland*, a

plaintiff may seek to prove that the force used by the police was excessive by reference to

the extent of the injuries he or she sustained during the encounter.[16] But establishing

excessiveness in this way requires a showing of more than a mere trivial injury. Thus, for

example, because handcuffs themselves are not necessarily an excessive use of force in

connection with an arrest, a plaintiff must show real and lasting injury in order to prove

that the officer used excessive force in the course of applying handcuffs; a temporary or

*de minimis* feeling of discomfort or pain will not suffice. *Compare Lyons v. City of*

*Xenia*, 417 F.3d 565 (6th Cir. 2005), *with Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th

Cir. 1993). *See also Graham*, 490 U.S. at 396 (holding that "[n]ot every push or shove"

rises to constitutional dimension under the Fourth Amendment (internal quotation

omitted)).

In the case before us, the only injury alleged by Ms. Cortez is a temporary sense of

intimidation. Whatever else one might say about what sort of injury is sufficient to

suggest excessive force, it seems to me that something more than this must be required.

Just as a claim for excessive force will not arise from handcuffing in the course of an

---

[16] *See generally Samuelson v. City of New Ulm*, 455 F.3d 871, 876 (8th Cir. 2006) (genuine issue of fact as to excessive force claim based in part on evidence that plaintiff sustained shoulder injury serious enough to require surgery); *Martin v. Bd. of County Comm'rs*, 909 F.2d 402, 407 (10th Cir. 1990) (finding excessive force where officers escorted plaintiff – who was injured from a recent automobile accident – out of hospital and into police van, drove less than five miles per hour to county jail, and released her approximately 90 minutes later; "Plaintiff has demonstrated that defendants' alleged deliberate and unreasonable conduct in effecting her arrest created a serious known risk of physical trauma resulting in aggravation of an existing fracture to her neck in violation of clearly established law.").

arrest absent some non-*de minimis* injury, neither should such a claim arise from a

transient feeling of intimidation during an investigative detention. It is helpful in this

regard to look to another area of the law where emotional distress to a plaintiff is found

actionable: the intentional infliction of emotional distress. Claims asserting only non-

physical injury may be stated solely where outrageous conduct causes *severe* emotional

distress. "The law intervenes only where the distress inflicted is so severe that no

reasonable man could be expected to endure it." Restatement (Second) of Torts § 46

(Comment j). Even in situations where police officers abuse their authority, a plaintiff is

nonetheless unable to recover for "*mere insults, indignities, or annoyances*." *Id.*

(Comment e) (emphasis added). It seems to me that what is true in the common law tort

context should be even more so in the constitutional context.[17]

I also cannot help but ask whether, if the majority allows Ms. Cortez to establish a

claim of excessive force based upon her bare allegation that she was intimidated, might

this imply the possibility that the use of virtually any force in the course of an unlawful

detention, no matter how mild and no matter whether any actual injury occurs, is

unconstitutionally excessive? It is, of course, axiomatic that Ms. Cortez will be fully –

and quite properly – compensated in her unlawful detention claim for the indignity,

---

[17]   The majority suggests that I would preclude excessive force claims involving non-physical injuries implicating one's sense of security or dignitary interests. Maj. Op. at 40 n.26. That is not the case. Rather, I have indicated only that our precedents, the guidance we have received from the Supreme Court, and analogous areas of law, all suggest that a plaintiff is entitled to show excessiveness in any case either by reference to the egregiousness of the force employed, in and of itself, or by reference to some non-*de minimis* injury, whether physical *or* non-physical.

humiliation, and sense of invasion associated with being unlawfully seized by the police in her home; her damages will encompass and compensate her as well for the manner and duration of that seizure. But those indignities, real and compensable though they are through an unlawful detention claim, ought not *also* give rise to an excessive use of force claim without *some* indicia of an actual, non-trivial injury to prove the excessiveness. In these circumstances, the majority's holding appears to conflate two analytically distinct violations of law and double counts the harm done to Ms. Cortez.

c.    Even if a constitutional violation did occur here, we would still be required to analyze whether a reasonable officer was on clear notice that the force used against Ms. Cortez was excessive for an investigative detention. Here again, the plaintiff and majority cite us to no case affording officers such notice.[18] Instead, the majority relies on our decisions in *Melendez-Garcia* and *Perdue* for the general proposition that officers must be able to articulate justifications for their use of force during investigative detentions. Maj. Op. at 40. But this is precisely the sort of generic rule that we and the Supreme Court repeatedly have held insufficient to afford sufficient notice to law enforcement. We have repeatedly held, and been instructed, that a court must identify

---

[18] They don't for good reason. In *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), a panel of this Court only recently held that officers were protected by qualified immunity from an unlawful detention claim even though they escorted witnesses (who were suspected of no crime themselves) into a home at gunpoint and detained them for more than an hour. The court explained that its decision was compelled by the lack of "direct guidance . . . on the outer contours of legally-permissible *detention* of witnesses." *Id*. at 1151 (emphasis added). Exactly the same might be said of the outer contours of what constitutes legally-permissible *force* in detaining witnesses.

specific law *clearly* indicating that the sort of conduct at issue constituted excessive force in an otherwise lawful investigative stop at the time it took place, *see supra* p. 2; this Ms. Cortez and the majority do not come close to doing, and – given how different the cases are in which officers have been held liable for excessive force – this they cannot do. The majority's extended discussion of another venerable decision, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), only serves to drive the point home. *Bivens* of course established the rule of law that damages may be recovered against federal officers for a violation of constitutional rights. *See* 403 U.S. at 397. The Court in *Bivens* never held – or even hinted – that the mere act of intimidation, without any showing of actual injury, rises to the level of excessive force.[19] That is a new adornment to our law, one that could scarcely have been imagined by any court thirty-five years ago.

\* \* \*

I respectfully dissent to the degree and for the reasons given above.

---

[19] Indeed, the majority relies on the Court's language describing the plaintiff's complaint, rather than upon any holding or even explanatory *dicta* from the Court itself. *Compare* Maj. Op. at 40-41, *with Bivens*, 403 U.S. at 389-90.